## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AAMCO TRANSMISSIONS, INC. | : | |
| 201 Gibraltar Road, Suite 150 | : | CIVIL ACTION |
| Horsham, PA 19044 | : | |
| Plaintiff, | : | |
| v. | : | No. |
| ISMAIL S. LATIF | : | |
| 411 Suncrest Towne Centre Drive | : | |
| Morgantown, WV 26505 | : | |
| Defendant. | : | |

### COMPLAINT

1.     Plaintiff, AAMCO Transmissions, Inc. ("Plaintiff" or "ATI"), is a Pennsylvania

corporation, with its principal place of business located at 201 Gibraltar Road, Horsham,

Pennsylvania 19044.

2.     Defendant, Ismail S. Latif ("Defendant" or "Latif") is a citizen of the State of West

Virginia and maintains a principal place of business at 411 Suncrest Towne Centre Drive,

Morgantown, WV 26505.

3.     This Court has jurisdiction pursuant to 15 U.S.C.A. §1121(a), and also pursuant to

28 U.S.C.A. §1338(b) relating to claims of unfair competition joined with a substantial and related

claim under the trademark laws, as well as pendent and ancillary jurisdiction of the state and

common law claims contained herein.

4.     Venue lies in this District pursuant to 28 U.S.C.A. §1391, in that ATI resides in

this District, Defendant has transacted business with ATI continuously over the last several years

in this District and the claims arise under a contract that was made in this District.

### BACKGROUND

5.     Since at least 1963, ATI has continually used the name "AAMCO" as its trade

name, trademark and service mark in connection with the operation of transmission repair centers.

It is the owner of the following marks registered on the principal register of the United States

Patent and Trademark office for "automobile repair services":

| Registration # | Description |
|---|---|
| 851,209 | The name "AAMCO". |
| 860,330 | Pictorial representation containing the name "AAMCO". |
| 1,127,710 | Pictorial representation containing the name "AAMCO Transmissions". |

6.    ATI is engaged in interstate commerce in, inter alia, the business of franchising or

licensing others to use the mark and name "AAMCO" in the operation of transmission repair

centers throughout the United States and Canada.

7.    The "AAMCO" trade name and trademark have become universally associated

with the repair of motor vehicle transmissions and the operation of transmission repair centers.

As a result, ATI owns common-law trade name and trademark rights in the name "AAMCO" and

in the marks described above.  By virtue of the long use and promotion and the resulting fine

public reputation of the trade name "AAMCO", there exists a secondary meaning in the name

"AAMCO" and the above marks.

8.    Large sums of money have been spent in advertising and promoting the services

sold under ATI's trade name and trademarks, and today ATI has a substantial business and a long

established goodwill associated with the name and the above marks in connection with the

services provided under its trade name and trademarks.

9.    ATI has a vital interest in protecting its trade name and trademarks and the

preservation and protection thereof are essential to the maintenance of ATI's quality transmission

repair centers and the goodwill and reputation associated therewith.  To supervise and control use

of its trade name and trademarks, ATI has established standards and policies governing the quality

of service to be provided to the public and has established procedures calling for the inspection of

franchisees' centers to determine that the standards and policies are being followed.

      10.    On December 10, 2007, ATI and Defendant entered into a franchise agreement,

pursuant to which Defendant was authorized to use and have used the name and mark "AAMCO"

in connection with the operation of an automotive repair center located at 411 Suncrest Towne

Centre Drive, Morgantown, WV 26505 (the "Center").   A true and correct copy of this franchise

agreement (the "Franchise Agreement") is attached hereto, marked as Exhibit "A" and

incorporated herein by reference.

      11.    In December of 2010, before Defendant commenced operation of the Center, he

attended ATI's intensive three (3) week training program in Horsham, Pennsylvania where he was

taught the AAMCO model of doing business.

      12.    Since the Center first opened, it has been advertised in the Morgantown

community, and is known as "AAMCO."

      13.    As provided under the Franchise Agreement, ATI shared with Defendant its

proprietary systems, information and trade secrets for opening and operating a successful

automotive repair business which ATI has developed over its 50 year history.

      14.    In addition, Defendant has been provided ATI's proprietary manuals, customer

lists and software.

      15.    Under the Franchise Agreement, ATI was entitled to perform any inspection

deemed by ATI to be necessary to determine the nature and quality of the services being rendered

there.   *See* Ex. "A" at § 8(m).

3

16.     In February of 2013, after receiving a tip from another franchised location doing

warranty work on a vehicle originally serviced at the Defendant's Center, ATI commenced an

ongoing investigation of vehicles that had received repair services and warranties issued from the

Defendant's Center.

17.     During the early months of 2013, ATI conducted its investigation of Defendant

which included:

      a.   Review of Repair Orders issued by Defendant's Center;

      b.   Forensic examination of customer vehicles that had been serviced at
         Defendant's Center;

      c.   Recorded and transcribed interview with Defendant's former center manager;
         and

      d.   Recorded and transcribed interview with the Builder at the AAMCO
         Transmission Center in Pittsburgh, Pennsylvania.

18.     As a result of the investigation, ATI discovered that Defendant had engaged in

fraudulent and deceptive practices by, among other things:

      a.   selling customers rebuilt transmissions which in fact were not rebuilt;

      b.   selling a customer a rebuilt torque converter that was not installed;

      c.   selling a customer a replacement uniframe that that was never replaced;

      d.   selling a customer a transfer case that was never replaced or rebuilt;

      e.   selling a customer a replacement exhaust system that was never replaced;

      f.   recommending unnecessary repairs to customers;

      g.   selling unnecessary repairs to customers;

      h.   representing to customers that work was performed that was not performed;
         and

      i.   representing to customers that parts were replaced that were not replaced.

4

19.     Pursuant to the Franchise Agreement, Defendant was contractually obligated to "deal fairly and honestly with AAMCO and with each customer". *See* Ex. "A" § 8(a).

20.     In the event Defendant breached the obligation to deal fairly and honestly with the public, ATI is entitled to immediately terminate the Franchise Agreement for cause. *See* Ex. "A" at § 19.1(d).

21.     In a letter dated April 3, 2013, ATI contacted Defendant and informed him that his franchise business had been the subject of a consumer protection investigation by ATI and that multiple instances of consumer fraud had been revealed.  ATI invited Defendant to come to ATI's home office in Horsham, Pennsylvania to discuss the findings of the investigation. A true and correct copy of the said letter is attached hereto and made a part hereof as Exhibit "B".

22.     In an email exchange with ATI's Vice President of Operations, Bruce Chidsey, who was trying to convince Defendant to accept ATI's invitation to come to Pennsylvania and meet, Defendant spurned ATI's overture. A true and correct copy of the said email string is attached hereto and made a part hereof as Exhibit "C".

23.     By letter dated April 16, 2013, ATI advised Defendant Latif that as a result of his dishonest and fraudulent actions in dealing with the public, his franchise was terminated effective immediately.  The letter further notified Defendant that he must comply with the Franchise Agreement's post termination obligations, expressly including the de-identification requirement, the non competition requirement, and the requirement to turn over all center telephone numbers to ATI.  A true and correct copy of the said letter is attached hereto and made a part hereof at Exhibit "D".

24.     Section 19.2 of the Franchise Agreements, entitled "Effect of and Procedures after Termination," provide that upon termination of the Franchise Agreements "for any reason", Defendants shall:

(2)  immediately and permanently discontinue the use of all AAMCO names and marks, signs, structures, all forms of advertising, telephone listings and service, manuals, software and all materials and products of any kind which are identified or associated with the System or AAMCO and return all such materials and products, including without limitation, the Operator's Manual, to AAMCO;

(3)  thereafter make no representations or statements for commercial benefit that Franchisee is or ever was in any way approved, endorsed, associated or identified with AAMCO or the System in any manner whatsoever or that Franchisee is a former AAMCO franchisee; provided, however, Franchisee shall reimburse AAMCO for all customer warranty repairs made within an applicable warranty period arising from work performed at the Center;

(4)  immediately take all steps necessary to amend or terminate any registration or filing of any fictitious name or any other registration or filing containing the AAMCO names and marks in order to effectuate the removal of the AAMCO names and marks from such registration or filing; and

(5)  thereafter refrain from establishing any HTML or other link between any web site created, maintained or used by Franchisee and AAMCO's home pages(s) or other part of its web site(s).

*See* Ex. "A" ¶ 19.2(a).

25.    The Franchise Agreements also contain a non-competition covenant which provides

in pertinent part that:

**Covenant Not-to-Compete.**  Franchisee acknowledges that as a franchisee of AAMCO and a participant in the System, Franchisee will receive or have access to confidential information and materials, trade secrets, and the unique methods, procedures and techniques developed by AAMCO.    Franchisee further acknowledges that the development of the marketplace in which his Center is located is solely as a result of the AAMCO name and marks.  Therefore, to protect the System, the AAMCO name and marks and AAMCO, and to induce AAMCO to grant Franchisee the franchise set forth in this Agreement, Franchisee represents and warrants....For a period of two (2) years after the termination of this Agreement for any reason, which two-year period shall not begin to run until Franchisee commences to comply with all obligations stated in this section 20, Franchisee shall not...within a radius of ten (10) miles of Franchisee's former Center and ten (10) miles of any other Center in operation at the time of termination or any Center that has commenced operation during the two-year period, begin or engage in any business the same as, similar to or in competition with such Center...

*See* Ex. "A" at § 20.

26.     Despite the termination of his franchise and any further authority to continue in business under and the use of the AAMCO name, Defendant has failed to take the actions required by the Franchise Agreement to remove the AAMCO name and trademark from the Center and cease all use of ATI's systems and AAMCO merchandising materials there and, instead, using ATI's AAMCO advertised telephone number for the Center, has continued to operate the Center under the name and style "AAMCO Transmissions", to hold himself out to be an authorized AAMCO franchisee, and to use the AAMCO trade name and trademark, without any license or right whatsoever.  Further Defendant has failed and refused to return any of ATI's trademarked or proprietary items in his possession.

## COUNT I
## TRADEMARK INFRINGEMENT

27.     ATI hereby incorporates by reference, as if fully set forth, paragraphs 1 through 26 above.

28.     Defendant has materially breached the terms and conditions of the Franchise Agreement by failing and refusing to deal fairly and honestly with AAMCO and center customers thereby extinguishing any contractual right of Defendant to use ATI's marks.

29.     Defendant has willfully and without justification failed and refused to comply with the post-termination provisions of the Franchise Agreement which require Defendant to, among other things, discontinue all use of the AAMCO name and trademark, surrender to ATI all items containing the AAMCO name and trademark, and transfer to ATI any and all telephone numbers listed under the AAMCO name.

30.     Unless Defendant is enjoined, ATI believes and therefore avers that he will continue their infringing use of the AAMCO trade name and trademarks at the Center.

7

31.     Unless Defendant is enjoined, his continued improper use of the AAMCO trade name and trademarks will greatly impair the value of the AAMCO trade name and trademarks, as well as ATI's reputation and goodwill.

32.     Defendant's continued failure and refusal to comply with those obligations has caused and continues to cause ATI irreparable harm to its reputation and goodwill, and substantial financial losses.

33.     The actions and conduct of Defendant as set forth in this Complaint constitute willful trademark infringement in violation of 15 U.S.C.A. §1125.

34.     The damages that have been occasioned by the willful trademark infringement that has been engaged in by Defendant is irreparable and continuing, and ATI has no adequate remedy at law.

35.     Pursuant to 15 U.S.C.A. §1116, ATI is entitled to injunctive relief to protect its rights under the Lanham Act.

36.     Pursuant to 15 U.S.C.A. §1117, ATI is entitled to recover Defendant's profits at the Center for the period since April 16, 2013, during which he has engaged in the above-described willful trademark infringement, plus any damages sustained by ATI, which damages may be trebled, plus the costs of this action and attorneys' fees.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendant and that an injunction be entered enjoining Defendant from (a) using the AAMCO name and trademark in any manner, (b) directly or indirectly engaging in the automotive repair business within a radius of ten (10) miles of the Center, or within a radius of ten (10) miles of any other AAMCO Transmission Center, and (c) interfering with Plaintiff's right to control or

transfer the Center telephone numbers.  Further, ATI requests that it be awarded money damages

incurred as a result of Defendant's breaches, including attorneys' fees and costs.

**COUNT II**
**BREACH OF LICENSE AGREEMENT – SPECIFIC PERFORMANCE**

37.    ATI incorporates by reference, as if fully set forth, the allegations contained in

paragraphs 1 through 36 above.

38.    After Defendant breached his obligation to deal fairly and honestly with the public,

ATI was entitled to terminate the Franchise Agreements for cause, which it did.

39.    As a result of the termination of Defendant's franchise, ATI is entitled to specific

performance of the Franchise Agreement, which require Defendant to, among other things, (a) de-

identify with the AAMCO name and trademarks, (b) refrain from operating an automotive repair

business from the former Center location for a period of two years, and (c) transfer to ATI all

telephone numbers listed for the Center.

40.    These restrictive covenants serve the legitimate business interests of ATI in that

they are designed to protect ATI's ability to develop the market, protect the integrity of its

system, retain its goodwill and re-establish the presence of the AAMCO name in this market.

41.    Although Defendant's franchise has been terminated, Defendant refuses to

relinquish his interest in the Center and, upon information and belief, continues to operate an

automtive repair businesses at the Center location using ATI's telephone numbers.

42.    In so doing, Defendant is unfairly competing with ATI and wrongfully interfering

with ATI's ability to develop the market, protect the integrity of its system, retain its goodwill and

re-establish the presence of the AAMCO name in this market, all of which is causing ATI

irreparable harm.

9

43.     ATI has no adequate remedy at law for damages, and unless specific performance of the procedures after termination, including the covenant not-to-compete, is ordered and injunctive relief granted to restrain Defendant's unlawful conduct, ATI will continue to suffer irreparable harm.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendant and that an injunction be entered enjoining Defendant from (a) using the AAMCO name and trademark in any manner, (b) directly or indirectly engaging in the automotive repair business within a radius of ten (10) miles of the Center, or within a radius of ten (10) miles of any other AAMCO Transmission Center, and (c) interfering with Plaintiff's right to control or transfer the Center telephone numbers.  Further, ATI requests that it be awarded money damages incurred as a result of Defendant's breaches, including attorneys' fees and costs.

### COUNT III
### COMMON LAW UNFAIR COMPETITION

44.     ATI incorporates by reference, as if fully set forth, the allegations contained in paragraphs 1 through 43 above.

45.     Defendant's conduct is in violation of the common law of unfair competition in that, amongst other things, he is:

(a)     Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods and services in connection with his conduct of business at the former Center;

(b)     Interfering with ATI's ability to re-franchise the territory of the former Center; and

10

(c)     Operating with ATI's trade secrets, confidential information and proprietary practices which it developed over the last five (5) decades in all aspects of the transmission repair business.

46.    These acts by Defendant have been committed willfully and with the intent to interfere with ATI's ability to fairly compete in the market of the former Center.

47.    Defendant's unlawful trade practices will irreparably harm and injure ATI in its business.

48.    ATI is without an adequate remedy at law.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendants and that an injunction be entered enjoining Defendant from (a) using the AAMCO name and trademark in any manner, (b) directly or indirectly engaging in the automotive repair business within a radius of ten (10) miles of the former Center, or within a radius of ten (10) miles of any other AAMCO Transmission Center, and (c) interfering with Plaintiff's right to control or transfer the Center telephone numbers. Further, ATI requests that it be awarded monetary damages incurred as a result of Defendant's unlawful conduct, including attorneys' fees and costs.

## COUNT IV
## BREACH OF CONTRACT

49.    ATI hereby incorporates by reference, as if fully set forth, the allegations contained in paragraphs 1 through 48 above.

50.    On or about October 19, 2011, Defendant ordered various items of equipment and advertising as part of his opening package from ATI for his Center totaling $200,071.44.

51.    In accordance with Defendant's order, ATI provided the said equipment and advertising to Defendant at his Center.

52.     Defendant failed and refused to pay ATI for all of the equipment and advertising provided, leaving a balance due and owing to ATI in the sum of $45,932.

53.     Although ATI has made repeated demands upon Defendant for payment of the $45,932, Defendant has refused and continues to refuse to pay the monies due and owing ATI.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendant in the amount of Forty Five Thousand Nine Hundred Thirty Two Dollars ($45,932) along with attorney fees and costs.

**COUNT V**
**BREACH OF FRANCHISE AGREEMENT**
**LOST FUTURE ROYALTIES**

54.     ATI hereby incorporates by reference, as if fully set forth, the allegations contained in paragraphs 1 through 53 above.

55.     Defendant has breached the Franchise Agreement by wrongfully terminating the said Agreement via uncurable default, effective on April 16, 2013.

56.     But for the wrongful termination of Defendant, ATI would have continued to earn and collect weekly franchise fees under the Franchise Agreement through December 10, 2022.

57.      By causing the termination of the franchise prematurely, Defendant has wrongfully deprived ATI of the franchise fees it would have been entitled to collect under the Franchise Agreement.

58.      The amount of lost fees suffered by ATI is yet to be calculated but is estimated to be in excess of $500,000.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendant in an amount to be determined.

## COUNT VI
## COSTS AND ATTORNEYS' FEES

59.     ATI hereby incorporates by reference, as if fully set forth, the allegations contained in paragraphs 1 through 58 above.

60.     Pursuant to Section 17(a) of the Franchise Agreements, Defendants agreed to pay all costs incurred by ATI in bringing this action, including attorneys' fees.

61.     Pursuant to 15 U.S.C.A. §1117, ATI is entitled to recover the costs of this action and attorneys' fees.

62.     Upon the filing of this Complaint, Plaintiff ATI has incurred a filing fee of Three hundred fifty dollars ($350.00) in this matter.

63.     Plaintiff ATI has incurred and continues to incur attorneys fees in the pursuit of this action.

WHEREFORE, Plaintiff, AAMCO Transmissions, Inc., requests judgment in its favor and against Defendant in an amount to be determined.

## COUNT VII
## DECLARATORY JUDGMENT

64.     ATI incorporates by reference, as if fully set forth, the allegations contained in paragraphs 1 through 63 above.

65.     Pursuant to 28 U.S.C. §2201, this Court has jurisdiction to determine disputes between Plaintiff and Defendants concerning the validity, operation and termination of the Franchise Agreement.

66.     An actual controversy exists between Plaintiff and Defendant as to whether Defendant is in default under the Franchise Agreement and as to the termination of said agreement.

67.     Plaintiff has performed all of its obligations under the Franchise Agreement and has not negligently or willfully caused any damage to Defendant.

68.     Plaintiff has properly determined that Defendant is in violation of his Franchise Agreement with Plaintiff because Defendant has, *inter alia* engaged in fraudulent and deceptive practices by recommending unnecessary repairs to customers, selling unnecessary repairs to customers, representing to customers that work was performed that was not performed, and representing to a customer that parts were replaced and/or refurbished that were not replaced and/or refurbished.

69.     Pursuant to the Franchise Agreement, Plaintiff may terminate the Franchise Agreement for one or more of the breaches set forth above.

70.     Plaintiff has given proper notice of termination of the Franchise Agreement to Defendant.

WHEREFORE, Plaintiff AAMCO Transmissions, Inc. requests a judgment in its favor and a Declaration that the Franchise Agreement is valid, that Plaintiff has fulfilled all of its obligations under the Franchise Agreement, that Plaintiff has not negligently or willfully caused damage to Defendant, that Plaintiff may terminate Defendant under the Franchise Agreement for one or more of the breaches described in this Complaint, and that Plaintiff has given proper notice of termination of the Franchise Agreement to Defendant.

Date: 4/25/13

Respectfully,

William B. Jameson
Attorney ID. # 58949
Attorney for Plaintiff
AAMCO Transmissions, Inc.
201 Gibraltar Road
Horsham, Pennsylvania 19044
(610) 668-2900

14

# EXHIBIT A



New 07_01_(8)

TABLE OF CONTENTS

Background ........................................................................................... 1
Section 1.    Grant of Franchise ................................................................. 1
Section 2.    Initial License Fee and Deposit ............................................ 2
Section 3.    Term ....................................................................................... 2
Section 4.    Location and Lease .............................................................. 2
Section 5.    Training, Security Deposit and Commencement of Business ......... 3
Section 6.    Services Rendered by AAMCO ............................................ 4
Section 7.    Operator's Manual ................................................................ 5
Section 8.    Certain Obligations of Franchisee ....................................... 6
Section 9.    Equipment, Inventory, Supplies and Signs .......................... 7
Section 10.   Franchise Fees and Business Reports .................................. 8
Section 11.   Advertising ........................................................................... 9
Section 12.   Insurance, Indemnity Agreement and Independent Contractor ......... 10
Section 13.   AAMCO Names, Marks and Trade Secrets; Protection of the System ......... 11
Section 14.   Warranty Program ............................................................... 12
Section 15.   Telephone Service ............................................................... 12
Section 16.   National Fleet Accounts Program ....................................... 13
Section 17.   Defaults in Payment and Expenses ..................................... 13
Section 18.   Restrictions on Change of Ownership ................................. 13
Section 19.   Termination and Procedures after Termination .................. 16
Section 20.   Covenant Not-to-Compete .................................................. 18
Section 21.   No Waiver ............................................................................ 19
Section 22.   Successors ............................................................................ 19
Section 23.   Notice ................................................................................... 19
Section 24.   Risk of Operations .............................................................. 19
Section 25.   Severability .......................................................................... 19
Section 26.   Jurisdiction, Venue and Controlling Law ............................ 20
Section 27.   JURY WAIVER .................................................................... 20
Section 28.   Mediation and Arbitration .................................................. 20
Section 29.   Entire Agreement ................................................................ 20

## *AAMCO Transmissions, Inc.*



## Franchise Agreement

This Agreement is entered into as of *Dec. 10*, 20*07*, by and between AAMCO Transmissions, Inc., 201 Gibraltar Road, Horsham, Pennsylvania 19044 ("AAMCO"), and *ISMAIL S. LATIF* _____ ("Franchisee").

As a result of extensive experience in the transmission and general automotive repair business, AAMCO has developed methods, procedures and techniques for the operation of AAMCO centers devoted to such repair business and AAMCO has built up substantial business and valuable good will by the establishment of such centers throughout the United States and Canada; and

AAMCO has developed a system (the "System") for conducting operations in the transmission and general automotive repair business which consists, in part, of the use of the "AAMCO" trade name and trademarks, AAMCO's methods, procedures and techniques, and a network of Centers devoted exclusively to the transmission and general automotive repair business ("Centers") which use the "AAMCO" name and the methods, procedures and techniques; and

AAMCO has created a substantial demand for its products and services by maintaining high standards of quality in its operation and in the operation of its franchised Centers and by extensive advertising; and

AAMCO makes its experience and know- how available to all its franchisees in order to assist them in opening and operating a successful AAMCO center.  AAMCO makes this and other means at its disposal available to aid in the management and merchandizing of Franchisee's center.

In recognition of the value of participating in the System, Franchisee desires to acquire a franchise to operate a Center;

The parties, intending to be legally bound, enter into this Agreement in recognition of these considerations and of the mutual promises and agreements contained herein.

1.      **Grant of Franchise.**

1.1      In consideration of the payment of the initial fees, as set forth in Appendix A attached hereto and made a part hereof, Franchisee shall have the right, subject to compliance with the terms and conditions of this Agreement, to operate a Center ("the Center"), under the "AAMCO" name and under any other trade names, trademarks, service marks and logos ("AAMCO names and marks") presently used, or which may hereafter be used in the System.

**1.2**   Franchisee's Center shall be located as follows: _____
_____ Metropolitan Statistical Area/Micropolitan Statistical Area (collectively "Statistical Area")

Address:          WEST VIRGINIA

Franchisee agrees to operate his Center at no other address.  Franchisee agrees not to move or relocate his Center without the express prior written approval of AAMCO, which approval shall not be unreasonably withheld.

(a)  AAMCO expressly reserves the right to grant additional franchises or establish other Centers in the same Statistical Area.  The number of Centers will be based upon then current motor vehicle registrations and the marketing program of AAMCO, and shall be limited to a maximum of one Center for each 100,000 motor vehicle registrations.  Notwithstanding this motor vehicle registration limit, Franchisee agrees that he does not have and is not being granted a protected trading area, specifically without limitation, in regard to the placement of other AAMCO Centers.

(b)  AAMCO or its affiliates may acquire or develop businesses or franchise systems that are in competition with the Center, including locations near the Center.  Franchisee agrees that AAMCO is under no obligation to compensate him for services performed by such businesses or franchise systems that are in proximity to the Center.

**2.**   **Initial License Fee and Deposit.**

(a)  Franchisee agrees to pay the sum of $31,500 as an initial license fee.   AAMCO acknowledges payment by Franchisee of a deposit of $16,500 to be applied to the initial license fee.  This deposit does not permit Franchisee to use the AAMCO names and marks or to operate a Center without compliance with other provisions of this Agreement.  An additional $15,000 is due at the start of AAMCO's operator training school.

(b)  Franchisee acknowledges that AAMCO shall incur expenses upon execution of this Agreement.  In the event of any termination, cancellation or rescission of this Agreement for any reason whatsoever, AAMCO will suffer damages not able to be determined; therefore, AAMCO, in addition to any other rights or remedies it may have, shall be entitled to retain any payments towards the initial license fee as liquidated damages.

**3.**   **Term.**

This Agreement shall begin as of the date set forth above and shall continue for a term of fifteen (15) years.  Unless either party gives written notice of its intention not to renew at least 180 days prior to the expiration of the fifteen-year term, Franchisee shall have the right to renew this franchise at the end of the term provided he is not then in default under the Agreement.  In connection with any renewal, Franchisee agrees to execute a franchise agreement of the type then currently being used by AAMCO, at least ninety (90) days, but not more than one (1) year, prior to the expiration of the term.  If, at least ninety (90) days prior to the expiration of the term of this franchise, Franchisee has not executed AAMCO's then current franchise agreement, this Agreement shall automatically terminate at the end of the term without further action by any party and Franchisee shall comply in full with section 19.2, Procedures after Termination.  AAMCO expressly reserves the right to increase the franchise fee upon renewal in accordance with its then current policy.  Notwithstanding anything in this section 3 to the contrary, any renewal of the franchise shall be subject to the other provisions of this Agreement regarding termination.

**4.**   **Location and Lease.**

(a)  Upon the execution of this Agreement, Franchisee agrees to proceed with due diligence to secure a location for the Center within the Statistical Area stated in section 1.2 of this Agreement, in accordance with the guidelines set forth in AAMCO's Center Opening Procedures Manual.  In the event Franchisee fails to open his Center for business within one year from the date of execution of this Agreement, AAMCO may, absent any extension of time agreed to in writing by AAMCO, immediately and without prior notice, cancel and terminate this Agreement.

(b)  Franchisee agrees not to execute any documents of purchase or lease for any such location without the prior written approval of AAMCO as to location, and terms of sale or lease, whichever is applicable.

(c)  If Franchisee purchases the Center location at any time during the term of this Agreement, or is the owner of the Center location prior to the execution of this Agreement, Franchisee hereby grants to AAMCO the option to lease the location on substantially the same terms and conditions contained in any lease under which Franchisee occupied the location as lessee, or if no such lease existed, then on terms and conditions that are

commercially reasonable. This option granted may be exercised by AAMCO for a period of thirty (30) days following the termination, rejection or rescission of this Agreement for any reason whatsoever.

(d) If Franchisee purchases the Center location at any time during the term of this Agreement, or is the owner of the Center location prior to the execution of this Agreement, Franchisee hereby grants to AAMCO, upon expiration or non-renewal, a right of first refusal to purchase or lease the Center location on terms and conditions that are commercially reasonable or on substantially the same financial terms and conditions of any binding third-party offer. This right of first refusal may be exercised by AAMCO for a period of thirty (30) days following such expiration or non-renewal; provided, however, this right of first refusal shall not apply if Franchisee himself is using the location so long as such use is in compliance with section 20(b) of this Agreement.

(e) If Franchisee is leasing the location, then, after AAMCO's written approval of the proposed location and lease, Franchisee shall execute the lease and agrees to deliver a copy of the fully executed lease to AAMCO. Franchisee agrees that the lease shall contain a conditional assignment clause which shall provide that, upon the termination or expiration of this Agreement for any reason whatsoever, AAMCO or its designee shall have the option for thirty (30) days to assume the obligations of and to replace Franchisee as the lessee under the lease and at any time thereafter reassign the lease to a new franchisee. Franchisee agrees not to terminate, renew or in any way alter or amend the lease during the Term or any renewal term of this franchise without AAMCO's prior written consent, and any attempted termination, renewal, alteration or amendment shall be null and void and have no effect as to AAMCO or AAMCO's interests.

(f) Except as otherwise provided in this Agreement, Franchisee agrees not to assign its lease or sublet the Center, or any portion of the premises containing the Center.

(g) If Franchisee chooses to design and construct his Center, Franchisee agrees to engage AAMCO's designated design and construction professional or, alternatively, to procure design and construction services from another source approved by AAMCO in writing.

(h) Franchisee agrees not to make any material change to the Center premises or adjacent areas without the prior written consent of AAMCO.

### 5.1 Training, Security Deposit and Commencement of Business.

(a) Prior to opening the Center for business, Franchisee must attend and successfully complete to AAMCO's satisfaction, AAMCO's operator's training school, which includes instruction, training and education in the operation of the Center. All expenses of travel, lodging, meals and any other expenses relating to attendance at such school shall be borne and paid by Franchisee. If Franchisee fails to complete training to AAMCO's satisfaction, AAMCO, in its sole discretion, may terminate this Agreement immediately, and this Agreement shall be of no further force and effect, and neither AAMCO nor Franchisee shall have any further liability or obligation to the other; provided, however, that the provisions of section 19 shall not be affected by any such termination.

(b) This paragraph applies to an OPERATOR who has signed a New License Agreement. Upon receipt of the Grand Opening Operations Development (GOOD) Training Fee, AAMCO shall provide a five (5) week on site Training program for OPERATOR and OPERATOR's staff during the first quarter of your Center operations. The Training will be held at OPERATOR's Center and be conducted during normal business hours.

(c) Franchisee agrees to attend such additional training or meetings at such locations as AAMCO may, from time to time, direct. All expenses incurred in connection with such attendance at training sessions or meetings shall be borne solely by Franchisee.

5.2 (a) Franchisee agrees to maintain at all times during the term of this Agreement a staff of trained employees sufficient to operate the Center in accordance with this Agreement. Franchisee agrees that all personnel whom Franchisee employs shall conform to the experience or skill standards which AAMCO may prescribe. Franchisee agrees to direct any of his employees to attend such meetings and training sessions as AAMCO may require, including directing the Center's technicians to obtain technical certification, as AAMCO may require, pursuant to AAMCO's technical certification program or a comparable technical certification program which complies with AAMCO's specifications. All expenses of travel, lodging, meals and any other expenses shall be borne and paid by Franchisee or the Center's employees. Franchisee agrees not to employ any person who may be required by AAMCO to complete a training program or otherwise meet training requirements, but who fails to do so for any reason whatsoever.

(b)  Franchisee acknowledges and agrees that the training of the Center's technical employees is essential to the successful operation of his Center.  Franchisee, therefore, agrees to participate in, pay for and buy all materials for the AAMCO Tech Video/DVD Library Program, DirecTech® and any other technical training programs as and when directed by AAMCO according to the terms and conditions as determined by AAMCO, or to participate in a comparable technical training program which complies with AAMCO's specifications.  Franchisee further agrees that, at the request of AAMCO, he will submit information about his participation in a comparable technical training program, including without limitation, invoices, lists of vendors from which Franchisee purchases such technical training programs and actual copies of such training.  AAMCO's Technical Services Department shall determine if any such technical training program is comparable.

(c)  Franchisee agrees that, regarding the hiring of employees for the Center, he will not initiate directly or indirectly any contact with any other person known to him to be employed by another AAMCO franchisee for the purpose of inducing such employee to work in Franchisee's Center; provided, however, nothing shall prevent Franchisee from advertising generally for employees to fill vacant positions.  Franchisee agrees to hire only those employees who, upon appropriate screening, demonstrate themselves to be honest and dependable.

**5.3**   (a)  Franchisee acknowledges that he has deposited with AAMCO the sum of $5,000 as security for compliance with all the provisions of this Agreement.  This deposit shall be retained by AAMCO and AAMCO shall have the right to reimburse itself or others, including customers of Franchisee's Center, from this account for any costs or expenses that may be sustained by AAMCO or others, as a result of failure by Franchisee to comply with any provision of this Agreement.  AAMCO has sole and absolute discretion in determining the amount of reimbursement from this account, and agrees to act reasonably in making such determinations.

(b)  Franchisee acknowledges that the creation and use of this account is a condition of the franchise, is intended to maintain a high level of customer satisfaction, and to minimize or resolve customer complaints.  It is agreed that AAMCO may use the funds to cure any default by Franchisee under this Agreement and to defray expenses, damages or attorneys' fees of AAMCO or others, reasonably necessary to cure any such default, including refunds to customers of Franchisee as AAMCO may determine.  AAMCO may send written notice to Franchisee of defaults calling for action under these provisions; however, Franchisee hereby authorizes AAMCO to apply the money in this account for the purposes specified in this provision without prior, actual notice to Franchisee that the money has been applied.

(c)  Franchisee agrees that should the amount on deposit with AAMCO become less than $5,000 because of any reason whatsoever, then Franchisee, upon notice from AAMCO, shall pay whatever amount is needed so that the amount on deposit equals $5,000.

(d)  AAMCO agrees to pay interest on this deposit at the rate of 3% less than prime rate as established by a leading bank as determined by AAMCO averaged over the preceding twelve months to a maximum of six percent (6%) per year, provided that Franchisee is, at all times, in full compliance with the provisions of this section.  AAMCO shall have no obligation to establish a separate bank account for such funds.

(e)  The deposit shall be reimbursed to Franchisee upon termination of this Agreement if the Center is sold by Franchisee in accordance with section 18.2 of this Agreement and the new franchisee assumes Franchisee's warranty obligations and pays a new security deposit with AAMCO.  In all other situations when this Agreement terminates, expires or is rescinded, AAMCO may use the deposit to cover the costs of warranty work arising from warranties issued by the Center prior to the termination, expiration or rescission of this Agreement; and AAMCO may retain the deposit for a period of three (3) years from the date of termination, at which time any remaining balance will be returned to Franchisee provided Franchisee has complied in full with sections 19 and 20 of this Agreement.  All warranty repairs charged under this subsection shall be performed at and in accordance with AAMCO's then current Intershop Warranty rate and policies and procedures.

**6.1**   **Services Rendered by AAMCO.**  AAMCO agrees to:

(a)  assist Franchisee in obtaining a location and negotiating a lease;

(b)  assist Franchisee with the layout of the Center and the installation of equipment;

(c)  assist Franchisee in finding and evaluating personnel;

(d) furnish to Franchisee the Operator's Manual described in section 7, parts catalogues, and instructional and training materials for the purpose of providing guidance in the methods, procedures and techniques of operating a Center;

(e)  furnish, from time to time, such business information, literature and materials as AAMCO determines may be helpful in improving the operations of the Center;

(f)  advise and consult with Franchisee during usual business hours on matters relating to the operation of the Center;

(g)  advise Franchisee of any new developments or improvements in the System;

(h)  assist Franchisee by providing Technical Consulting services for use by all franchisees. These services will include Technical Hot Line Department, Publication of Technical Advisory bulletins, Publication of Technical Bench tips, Publication of Technical Bench notes, Publication of Technical columns in the Twin Post, Production of video training films, the availability of the Rebuilders Academy and additional in-house only training seminars.  AAMCO further agrees that the ratio of the Technical Department's expenditures to franchise fee revenue for the provision of these services will be the minimum ratio maintained for the provision of these services.

(i)  provide initial training, the GOOD training and other additional training programs, sessions and meetings as AAMCO may determine;

(j)  assist in the design of advertising promoting the business of AAMCO franchisees and the services they sell; and make available to Franchisee its experience, know-how, guidance, and counseling with respect to national, regional, and/or local advertising, and combinations thereof, including the selection of particular media and advertising content, as well as the choice of agencies for the purchase and use of these advertising techniques; and

(k)  continue to protect the good will and reputation associated with the AAMCO name and marks and other distinguishing aspects of the System.

**6.2**  AAMCO agrees that, before AAMCO grants any additional franchise in the Statistical Area in which Franchisee's Center is located, it will conduct a marketing study and will receive and consider input and comments from Franchisee.

**7.1**    **Operator's Manual.**

(a)   AAMCO shall lend to Franchisee a manual produced and published by AAMCO (the "Operator's Manual") which includes, in part, the business procedures, technical advice, policies and procedures, and rules and regulations for the operation of the Center.

(b)  Franchisee agrees that he will comply with all of the policies and procedures which AAMCO establishes from time to time including those set forth in AAMCO's training manuals as modified and/or updated from time-to-time as determined by AAMCO in its sole discretion.

**7.2**    Franchisee acknowledges and agrees that:

(a)  the Operator's Manual is the property of AAMCO and shall remain its property during the term of this Agreement and any renewals;

(b)  the Operator's Manual contains confidential information which Franchisee will protect as a trade secret, and that its loss will cause substantial damage to AAMCO and the System although the amount of such loss would be incalculable with any degree of accuracy.  Consequently, in the event of loss of this Operator's Manual, Franchisee agrees to pay to AAMCO such sum as may be agreed upon for its replacement, as liquidated damages and not as a penalty;

(c)  Franchisee will not reprint or reproduce any portion of the Operator's Manual for any reason whatsoever;

(d)  upon termination of this Agreement for any reason, the Operator's Manual will be immediately returned to AAMCO.

8.     **Certain Obligations of Franchisee.**  In order to maintain the high quality and uniform standards associated with the System and to protect its good will and reputation, Franchisee agrees to:

(a)  deal fairly and honestly with AAMCO and with each customer, and that he will render prompt, workmanlike, courteous and willing service in his Center

(b)  operate his Center in such a manner so as to avoid customer complaints, since any customer complaint cause harm to the growth of AAMCO's national identity, reputation in the marketplace and association of its name with quality repairs.  Franchisee agrees that any customer complaints generated by his Center, including but not limited to those in which customers allege abuse, fraud, deceptive or unfair trade practices, cause such harm individually and in the aggregate.  Franchisee agrees to handle all customer complaints and adjustments in the same fashion whether they arise from his Center or from any other AAMCO center.

(c)  honor and comply with the terms of all advertising placed by or at the direction of AAMCO or Franchisee;

(d)  devote his/her best efforts to the day-to-day operations and development of the business of the Center;

(e)  operate the Center exclusively as an automotive repair and servicing business and not engage in any other business at the Center, except as otherwise approved in writing by AAMCO;

(f)  keep the Center open for business the minimum number of days per week and hours per day as may be prescribed by AAMCO in the Operator's Manual from time to time;

(g)  design, keep and maintain the Center and its appearance in an attractive, clean, safe and orderly manner consistent with the operation of a first class automotive business and any directives of AAMCO deemed by it to be necessary to protect the standards of quality and uniformity of the Centers and the System, including (1) interior and exterior painting and décor, (2) shop and sales office layout and character of interior furnishings, and (3) use and display of such signs, emblems, logos, lettering and pictorial materials as required or approved by AAMCO;

(h)  operate the Center in accordance with the methods, policies and procedures, and techniques included in the Operator's Manual and other training manuals and materials, as modified and/or updated from time to time as determined by AAMCO in its sole discretion, or otherwise approved by AAMCO;

(i)  conduct his Center in a manner so that it will not detract from nor bring into disrepute the AAMCO name and marks;

(j)  comply at all times with all federal, state, provincial, county, city, municipal and other local laws, regulations and ordinances applicable to Franchisee's business;

(k)  maintain at all times (except when fire or other casualty so prevents) sufficient supplies and personnel to operate the Center at maximum capacity and efficiency, including a full time Customer Service Manager (other than Franchisee) who is primarily responsible for customer contact within the Center, and who has successfully completed AAMCO's CSM training program;

(l)  operate the Center under the name AAMCO and under no other name unless directed in writing by AAMCO, and use and display the AAMCO name and marks prominently in such manner as may from time to time be directed in writing by AAMCO and not use or prominently display any other trade name, trademark, service mark or other designation during the term of this Agreement;

(m)  permit AAMCO during business hours to inspect the premises of the Center, confer with Franchisee and Franchisee's employees and customers, check equipment and inventories, methods, books and records, and perform any other inspection deemed by AAMCO to be necessary to determine the nature, quality and uniformity of service rendered at the Center in order to protect the System and to determine Franchisee's performance under this

Agreement. Franchisee specifically agrees that neither his physical presence in the Center nor his specific consent to any such inspection shall be necessary;

(n) submit to AAMCO uniform business and financial reports and financial statements in accordance with the procedure set forth in the Operator's Manual, and deliver a copy of Franchisee's federal income tax return relating to the operations of the Center within thirty (30) days after such return is filed. If AAMCO adopts as part of the System a format of reporting via electronic polling, Franchisee agrees to submit his uniform financial reports through the internet or other electronic means which is compatible with software used by AAMCO for such purpose;

(o) maintain a system of bookkeeping and recordkeeping as requested by AAMCO, keep his books and records at the Center at all times and make them available during business hours to authorized representatives of AAMCO for the purpose of verifying the accuracy of Franchisee's business and financial reports. If such verification reveals that the gross receipts reported by Franchisee to AAMCO are more than two percent (2%) less than Franchisee's actual gross receipts, Franchisee agrees to reimburse AAMCO for all expenses connected with such verification, including, but not limited to, reasonable administrative, accounting and legal fees, and without limitation to any other rights and remedies AAMCO in its sole discretion, may elect to pursue. Franchisee shall pay to AAMCO immediately any deficient and delinquent franchise fees, together with interest at the rate of eighteen percent (18%) per annum calculated from the date when franchise fees should have been paid to the date of actual payment. Franchisee further acknowledges and agrees that the actual damages sustained by AAMCO in the event of underreporting of gross receipts are difficult to ascertain and that in addition to the fees, interest and expenses stated above, Franchisee shall also pay AAMCO liquidated damages in an amount equal to the franchise fees due plus interest as calculated above. These liquidated damages shall be in addition to any other remedies AAMCO may have.

(p) use only such forms as AAMCO specifically prescribes or authorizes including, without limitation, AAMCO diagnostic forms, AAMCO warranty cards, AAMCO reporting forms and consecutively numbered AAMCO repair orders for which AAMCO may make a reasonable charge.

(q) offer to customers of his Center all services, products and/or warranties which AAMCO may prescribe. Franchisee acknowledges that AAMCO retains the exclusive right to make modifications from time-to-time to such services, products and/or warranties.

(r) pay the franchise fee and all other fees and/or charges arising under this Agreement and related agreements by electronic funds transfer as described in section 10(e) below and sign all documents necessary to effect such electronic funds transfer as may be requested by AAMCO from time to time.

(s) periodically upgrade and/or remodel the Center as AAMCO may, from time to time, deem necessary to promote the standards of quality and uniformity of the Centers and the System, including replacing and/or upgrading exterior and interior signs and décor, provided that no such upgrading or remodeling during the term will require any increase in the square footage of the Center premises, and further provided that no substantial upgrades or remodeling, defined as in excess of $15,000, shall be required more than once every six (6) years during the term or involve a capital cost of more than $25,000 during the term of this Agreement.

### 9.   Equipment, Inventory, Supplies and Signs.

**9.1   Standards and Specifications.** AAMCO shall fix and determine all standards, specifications and requirements for the equipment, including diagnostic and technical equipment, supplies, parts, and assembly sets used by Franchisee in his AAMCO Center. Franchisee may purchase these items from any source, so long as they conform to these standards and specifications. AAMCO agrees to furnish these standards and specifications to Franchisee, or to a vendor or manufacturer, without charge. Franchisee acknowledges that AAMCO may change such standards, specifications and requirements from time-to-time, and agrees to make any additional purchases of equipment and/or supplies needed to comply with such updated requirements.

**9.2   Original Equipment, Supplies and Inventory.** Franchisee agrees that, prior to the opening of his Center, he will purchase the equipment, supplies and inventory listed at Appendix A of this Agreement. Franchisee agrees to submit to AAMCO receipted invoices from the suppliers for any of these items which AAMCO may request and shall certify to AAMCO, if requested, that the items comply with the standards and specifications of AAMCO. If Franchisee requests to purchase equipment and supplies from or through AAMCO, AAMCO agrees to supply them at the price then in effect; provided, that if prior to delivery the price to AAMCO shall increase, then AAMCO may proportionately

increase the price to Franchisee.  If any item is not available at the time of request, then AAMCO may substitute merchandise of a similar quality, and adjust the price, after notice to Franchisee.

>        **9.3    Operating Inventory.**  Franchisee acknowledges that the consumer acceptance, quality, and standardization of parts and assembly sets used by AAMCO Centers, and agrees that the use exclusively of parts and assembly sets which comply with AAMCO's specifications is an essential condition of the performance of this Agreement. Franchisee agrees to purchase and use parts and assembly sets which comply with AAMCO's specifications.  At the request of AAMCO, Franchisee will submit a certification that he uses parts and assembly sets which comply with AAMCO's specifications.

>        **9.4    Product Warranties.**  There are no warranties, express or implied, made by AAMCO under this Agreement for the products purchased by Franchisee, including the implied warranty of MERCHANTABILITY.

>        **9.5    Signs.**  Franchisee agrees to erect outside and inside his Center signs of such size and construction as approved by AAMCO.  No other signs may be erected or used.  Franchisee acknowledges and agrees that AAMCO shall have exclusive control of the use and display of all sign faces bearing the AAMCO name or marks.

>        **10.    Franchise Fees and Business Reports.**

>        (a)  During the term of this Agreement, Franchisee agrees to pay to AAMCO a franchise fee (the "franchise fee") equal to seven and one-half percent (7½%) of the gross receipts of all business transacted by Franchisee. "Gross receipts" shall mean all forms of consideration received by the Center for all work, sale of parts, supplies or accessories or services, sold, completed and delivered to customers of the Center, exclusive of sales tax.  Franchisee agrees that the franchise fee shall be paid weekly on each Tuesday based upon gross receipts during the preceding calendar week.  The franchise fee shall be remitted simultaneously with a report showing its computation upon the forms or reports or in a format provided, required or approved by AAMCO.  Franchisee agrees that AAMCO may, require Franchisee to submit the reports via electronic polling from Franchisee to AAMCO through the internet or other electronic means which is compatible with software used by AAMCO for such purpose.

>        (b)  Franchisee acknowledges and agrees that failure to furnish complete and accurate reports of business on a timely basis deprives AAMCO of the means to control and supervise the use of its marks or to communicate with members of the motoring public who are customers of AAMCO Centers.  In addition to an accurate report of gross receipts in the manner or on the forms prescribed by AAMCO, Franchisee agrees to submit such copies of customer repair orders as directed by AAMCO.

>        (c)  Franchisee agrees that the franchise fee and all other fees, charges and/or amounts owed by Franchisee under this Agreement, specifically including, but not limited to, any sums due for any advertising, whether national, regional, local and/or national creative, pursuant to section 11 below, shall be remitted to AAMCO via electronic funds transfer ("EFT") from the designated account(s) of Franchisee's financial institution.  Prior to opening his/her Center, and from time to time thereafter as events may require, Franchisee agrees to provide AAMCO written authorization, and such other information as AAMCO may require, in such form as shall be approved by AAMCO, which shall authorize and/or enable Franchisee's financial institution to accept debit originations, electronic debit entries, or other EFT, and electronically deposit franchise fees and other sums owed under this Agreement directly to AAMCO's bank account(s).

>        (d)  Franchisee agrees to authorize AAMCO to withdraw funds by EFT upon or after the funds become due to AAMCO under this Agreement, at such days and times as AAMCO shall determine.  Franchisee agrees that it shall be an event of default under section 19.1 of this Agreement if Franchisee closes or otherwise makes Franchisee's designated account(s) inaccessible by AAMCO without completing the following before or promptly after the account is made inaccessible:

>>        (1)  notifying AAMCO in writing of such event;

>>        (2)  establishing another designated account(s) for EFT withdrawals; and

>>        (3)  providing the written authorization and information required in subsection (c) above.

>        (e)  Franchisee agrees that if AAMCO has not received from Franchisee, by 12 noon Eastern time on each Tuesday, a report of gross receipts from the Center's sales for the preceding week by written statements or business reports in the form prescribed by AAMCO under section 10 of this Agreement or by electronic polling, then AAMCO shall be entitled to withdraw by EFT from Franchisee's designated account(s) the appropriate franchise fee

based on an arithmetic average of Franchisee's weekly gross sales reported to AAMCO over a number of previous weeks as determined by AAMCO or based on some other means of estimating Franchisee's gross sales as determined by AAMCO. If a business report in the form of a statement required under this section 10 is subsequently received and reflects (1) that the actual amount of the franchise fee due was more than the amount of the EFT by AAMCO, then AAMCO shall be entitled to additional funds by EFT from Franchisee's designated account(s) for the difference or (2) that the actual amount of the franchise fee due was less than the amount of the EFT by AAMCO, then AAMCO shall credit the excess amount to the payment of Franchisee's future franchise fee.

(f) Franchisee agrees that, upon written notice from AAMCO, he may be required to pay any amount(s) due under this Agreement directly to AAMCO by check or other non-electronic means, instead of by EFT, solely at AAMCO's discretion.

### 11.    Advertising.

**11.1    National Creative Advertising**.  Franchisee agrees to pay his proportionate share of "National Creative Advertising" in accordance with the formulas which will be provided by the National Creative Committee and administered by AAMCO.  Payment for National Creative Advertising shall be made to AAMCO in accordance with its instructions, including compliance with section 10(c) providing for payment by EFT.

**11.2    Local Advertising**.

(a) Franchisee acknowledges and agrees that all advertising must be approved by AAMCO in advance of its use and Franchisee agrees not to use any advertising unless and until such has been approved in writing by AAMCO.  Franchisee specifically agrees to participate in and pay for the national Yellow Pages program of AAMCO and agrees not to place Yellow Pages advertising in any other manner.  Franchisee further agrees to use, display or distribute in or about the Center any advertising, promotional or informational materials that AAMCO may provide from time to time and to follow AAMCO's instructions regarding such materials.

(b) Franchisee acknowledges that, in addition to Yellow Pages advertising, it is mandatory to employ advertising at the local level and to participate in and pay for advertising programs and promotional activities at the local level.  Franchisee agrees to share local advertising expenses with other franchisees in the Designated Market Area (DMA) as defined by A.C. Nielsen Company which may change from time-to-time and to execute all local ad pool documents as may be required and approved by AAMCO.

(c) If Franchisee's AAMCO Center is not part of a DMA, is the only AAMCO Center in a DMA, or in the event a majority of the Centers in the DMA vote not to implement a local advertising buy and budget, or not to have a locally administered advertising pool, then, unless Franchisee documents expenditures for local advertising pursuant to this section, Franchisee shall pay to AAMCO a weekly continuing advertising fee (the "continuing advertising fee") of either (i) for those Centers located in one of the top 20 DMAs based on population as determined by A. C. Nielsen Company, the greater of five percent (5%) of the gross receipts of the Center or $500 or (ii) for Centers located in all other DMAs, the greater of four percent (4%) of the gross receipts or $400, which shall be payable weekly, at the same time and in the same manner as set forth in section 10 of this Agreement; provided, however, if National or Regional Advertising is implemented pursuant to section 11.3, AAMCO may proportionally reduce this continuing advertising fee.  If the local ad pool assessment is less than the continuing advertising fee, then Franchisee shall remit to AAMCO on a weekly basis the difference between the local ad pool assessment and the continuing advertising fee.  If Franchisee documents, in a form directed by AAMCO, expenditures with an approved advertising agency or directly with an advertising vendor or vendors in amounts prescribed by subparagraphs (c)(i) or (c)(ii) above, then payment of the continuing advertising fee shall be waived.

(1) The continuing advertising fee shall not be used for general operating expenses of AAMCO, but shall be used and expended for media costs, commissions, fees, production and development costs not covered by the national creative advertising fee, and other costs of all advertising which is published, broadcast, displayed or otherwise disseminated, including by any electronic means such as the internet or telephone, either during the calendar year in which such continuing advertising fee is received by AAMCO or during the immediately succeeding calendar year.  AAMCO may, in its sole discretion, suspend the placement of advertising for Franchisee using such continuing advertising fees if any payments due AAMCO under this Agreement or any other agreement in effect between the parties are not paid as and when due.  Any such suspension may continue until Franchisee has paid in full all sums currently owed to AAMCO.  Franchisee is not relieved of any obligation to pay such continuing advertising fees during the term of any suspension.  During the term of any such suspension, Franchisee shall be prohibited from placing advertising pursuant to section 11.2(g).

(2) All decisions from time to time regarding the selection of the particular media, and the advertising content, for advertising paid with continuing advertising fees shall be within the sole discretion of AAMCO and such agencies or others as it may appoint. AAMCO or its designated agencies may retain commissions or prepaid discounts for the placement of such advertising and, for any non-commissionable media, may charge a fee not to exceed ten percent (10%) for the administration and placement of such advertising.

(d) Franchisee acknowledges that AAMCO has the right to approve an advertising agency, which approval shall not be unreasonably withheld, and Franchisee agrees to place advertising only with an agency approved by AAMCO; Franchisee agrees to pay promptly fees which become due to any such agency.

(e) Franchisee agrees that, if Franchisee fails to pay promptly an amount due his advertising agency or his local advertising group or pool, then either AAMCO, or other AAMCO franchisees in the local advertising group or pool of which Franchisee is a member, or the local advertising group or pool itself shall be entitled to recover the amount due from Franchisee. Franchisee acknowledges that all local advertising benefits him and the other franchisees in the local advertising group or pool. Franchisee acknowledges that despite failure to contribute to his local AAMCO advertising group or pool, local advertising expenditures by such group or pool confer substantial benefits on him, and further acknowledges his responsibility for payment therefor. AAMCO specifically reserves the right to have or allow the local AAMCO advertising group or pool to seek enforcement of this obligation.

(f) Franchisee may engage in any advertising or promotion of his Center or business, in addition to the advertising or promotion set forth in this section 11, provided that such advertising or promotion shall be at the sole cost of Franchisee and without deduction or credit against any fees or other sums owed by Franchisee under this section 11.

(g) Franchisee agrees not to create, maintain or use a web site or other form of electronic media not paid for or approved in writing by AAMCO for the purpose of advertising or promoting his Center or business; not to create or adopt, use or register any domain name that uses in any manner, the AAMCO names and marks; and, not to establish any HTML or other link between any web site created, maintained or used by Franchisee and AAMCO's home page(s) or other part of its web site(s) without AAMCO's prior written approval.

### 11.3    National or Regional Advertising.

(a) Franchisee agrees to participate in advertising programs at the national and/or regional levels if and when established or directed by AAMCO. Franchisee agrees to pay his proportionate share of National or Regional Advertising and publicity in accordance with reasonable formulas provided by AAMCO. Payment for such National or Regional Advertising billings and costs shall be made in accordance with AAMCO's instructions.

(b) Franchisee agrees that AAMCO may, from time to time, designate an AAMCO web site for the purpose of advertising the AAMCO names and marks and services associated with the System as well as individual Centers. Franchisee acknowledges and agrees that all parts of the designated web site, including any web page(s) dedicated to his Center, are the property of AAMCO and that AAMCO has sole and exclusive right and authority to change or terminate the web site in total or in part, as AAMCO deems appropriate.

### 12.1    Insurance.

(a) Franchisee agrees to purchase and, at all times during the term of this Agreement, maintain in full force and effect policies of insurance as follows: (i) Worker's Compensation insurance, in amounts prescribed by law; (ii) insurance against all types of public liability including employer's liability insurance, liability insurance under a comprehensive general liability policy, with bodily injury and property damage liability insurance, garage liability, garage keeper's legal liability and direct primary coverage, products liability or completed operations liability insurance, automobile liability insurance, including owned and non-owned hired motor vehicles, and customer automobile liability insurance; and (iii) such additional insurance as may be required by the terms of any lease for the premises of the Center.

(b) Franchisee agrees that all policies of insurance required under this section shall be in form with companies reasonably satisfactory to AAMCO and in such amounts as AAMCO shall reasonably determine, which amounts, in no event, shall be less than $1,000,000 per occurrence, bodily injury and property damage combined. Franchisee acknowledges and agrees that AAMCO reserves the right to increase the amounts of insurance required by this section and further agrees to comply with such increased amounts after notice from AAMCO. AAMCO agrees to act reasonably in determining such increased amounts. Franchisee agrees that such policies shall protect, as named

insureds, Franchisee, AAMCO and any other party designated by AAMCO and that such policies shall contain an endorsement which provides that only actual notice to insured, if an individual, or to any executive officer of insured, if a corporation, shall constitute knowledge of the insured. Franchisee agrees to furnish to AAMCO, any other named insured, and all other persons designated by AAMCO, certificates issued by each of Franchisee's insurers indicating that all required insurance is in full force and effect and will not be terminated or changed without at least thirty (30) days prior written notice from the insurer to each certificate holder. New certificates evidencing renewal of such insurance shall be furnished at least thirty (30) days prior to the date of expiration of each such policy. Within five (5) days of any request by AAMCO, Franchisee agrees to deliver the original of all such insurance policies to AAMCO for examination.

(c) If Franchisee fails to obtain or maintain any insurance policy containing all the coverages, clauses and provisions required under this section, AAMCO may, at its election, obtain and maintain such insurance for and in the name of Franchisee. Within fifteen (15) days of any written request of AAMCO, Franchisee agrees to furnish all information necessary to obtain and maintain such insurance and to pay all costs thereof.

**12.2   Indemnity Agreement.** Franchisee agrees to protect, defend and to hold harmless and indemnify AAMCO from any and all claims, demands, losses, damages, costs, suits, judgments, penalties, expenses and liabilities of any kind or nature (collectively "Claims"), and to pay to AAMCO all costs, expenses and liabilities which may be associated with such Claims, which are based on or arise out of or relate in any way to the operation or the condition of Franchisee's Center or this Agreement. This agreement to indemnify AAMCO set forth in this section shall be given effect whether the Claim arises indirectly or directly out of the Center's operation, Franchisee's conduct of his business there, the ownership or possession of real or personal property there or from or by any act of negligence, omission or willful conduct by Franchisee or by any of his employees, servants or agents. The minimum amounts of insurance outlined in section 12.1 shall not be construed to limit liability under this section of the Agreement. Franchisee also agrees by this Agreement to pay on behalf of AAMCO any and all fees, costs, or other expenses which AAMCO reasonably incurs as a result of any investigation or defense of any such claim, including reasonable attorneys' fees.

**12.3   Independent Contractor and Relationship of the Parties.**

(a) Franchisee acknowledges and agrees that the relationship between AAMCO and Franchisee is strictly that of a franchisor and a franchisee and Franchisee is an independent contractor and not an agent, employee, partner or joint venturer of AAMCO for any purpose whatsoever. This Agreement does not create a joint venture, partnership, or agency and any act or omission of either party shall not bind nor obligate the other, except as expressly set forth in this Agreement. Franchisee agrees that he is not authorized in any way to make a contract, agreement or promise, or to create any implied obligation on behalf of AAMCO and agrees not to do so.

(b) Franchisee agrees that, in all public records and in his relationship and dealings with third parties, as well as on stationery, letterheads and business forms, to indicate his independent ownership of the Center and that he is a franchisee of AAMCO. Franchisee agrees to conspicuously display both inside and outside the Center a notification that the Center is independently owned and operated.

(c) Franchisee recognizes that AAMCO has entered into this Agreement in reliance upon and in recognition of the fact that Franchisee does and will have full responsibility and authority for the management and operation of the Center; and that his success, and that of all Centers, depends on adherence to the highest standards of business practice and on the maintenance of prompt, efficient, courteous, workmanlike and satisfactory service to the public.

**13.1   AAMCO Names, Marks and Trade Secrets; Protection of the System.**

(a) Franchisee hereby acknowledges the validity of the AAMCO names and marks and that AAMCO is the owner of all right, title and interest in such names and marks. Franchisee agrees that he will use the AAMCO names and marks only in full compliance with specifications prescribed from time to time by AAMCO and that all such usage and the goodwill established thereby shall inure to the exclusive benefit of AAMCO. Except as expressly granted in this Agreement, Franchisee acknowledges and agrees that nothing contained in this Agreement shall be construed as giving to Franchisee or to any other person or entity, any right or interest in the AAMCO names and marks, trade secrets, methods, procedures or techniques developed by AAMCO and used in the System. Further, except as provided for herein, nothing contained herein shall be construed as limiting AAMCO's right, title or interest in the AAMCO names and marks, trade secrets, methods, procedures and techniques which are a part of the System or AAMCO's sole and exclusive right to register, to use and to license others to use such names and marks, trade secrets, methods, procedures and techniques.

(b) Franchisee represents, warrants and agrees that:

(1) he will not contest, directly or indirectly, AAMCO's ownership, title, right or interest in the AAMCO names and marks, trade secrets, methods, procedures and techniques which are a part of the System or contest AAMCO's sole right to register, to use, and to license others to use such AAMCO names and marks, trade secrets, methods, procedures and techniques and any other mark or name which incorporates the word "AAMCO"; and

(2) with the exception of the use of the names and marks in the manner expressly specified and authorized under this Agreement and the registration of a fictitious name solely in connection with the operation of the Center, he will not use or register or attempt to use or register in Franchisee's name or in the name of any other person or entity any name or mark, corporate name or any designation of any kind using the AAMCO names and marks, or any other materials or electronically transmitted information used in the System.

**13.2    Non-Disclosure.**  Franchisee agrees that, except in the ordinary course of business of the operation of his Center, he will not disclose or furnish to any person or entity any information or data concerning AAMCO's service program, training, diagnostic and technical materials, operations techniques, advertising or promotion ideas, or concerning the financial status of AAMCO, and that he will keep and maintain such data, information and materials as trade secrets of AAMCO.  Franchisee acknowledges and agrees that AAMCO is the sole owner of all rights to the AAMCO service program, and of all books, manuals or documents provided to Franchisee for the operation of his Center. Franchisee recognizes that AAMCO has expended substantial funds and effort in the development of its service program, training, diagnostic and technical materials, and operating techniques, and he specifically agrees not to engage in competition with AAMCO using any training or policy manuals, catalogues, lists, forms or aids provided by AAMCO.

**13.3    Protection of System.**

If Franchisee learns of any actual or threatened infringement or piracy of the AAMCO names and marks, trade secrets, methods, procedures or techniques used in the System (the "Infringement") or of any infringement or piracy claim made against Franchisee by a party other than AAMCO ("Third Party Claim"), Franchisee agrees to immediately notify AAMCO in writing of the Infringement or Third Party Claim.  AAMCO shall have the right to determine what action, if any, to take with respect to such Infringement or Third Party Claim and shall bear the expense of any such action. Franchisee agrees to give his full cooperation in such action if so requested by AAMCO.  If Franchisee is named as a party in any legal proceeding brought by a party other than AAMCO for infringement of trade names, trademarks, service marks, copyrights or trade secrets based upon Franchisee's use of the AAMCO names and marks, any such proceeding shall be defended and held harmless in the name of Franchisee, by and at the expense and direction of AAMCO.

**14.1    Warranty Program.**  Franchisee agrees to honor each warranty presented by an AAMCO customer in accordance with its terms, regardless of whether the service was rendered at his Center or at some other authorized AAMCO Center.  Franchisee agrees to comply at all times with AAMCO's policies concerning the AAMCO warranty program.

**14.2    Warranty Payment Rates.**  Franchisee shall be entitled under this Agreement to receive from another AAMCO Center the costs of supplies, accessories and parts which Franchisee uses in honoring the warranty, plus a sum of money based on either an hourly rate for labor or a flat fee, depending on the extent of repairs required. The payment rate used in making payments under this section will be determined by AAMCO and published to all franchisees. Franchisee agrees to immediately pay to any other AAMCO Center the amount due to such other Center for honoring of a warranty issued to a customer of Franchisee.  If Franchisee fails to pay promptly any amount due under this section, AAMCO shall be entitled to recover such amount from Franchisee for the benefit of the other AAMCO Center, or to credit such other Center for money which may be due and owing to Franchisee for such payments.

**14.3    Prohibition Against Other Warranties.**  Franchisee agrees to make no warranties or guarantees other than those contained in the printed forms of warranty issued or approved by AAMCO.  Franchisee acknowledges and agrees such warranties and guarantees are made by Franchisee to the customer and that there are no warranties expressed or implied made by AAMCO to the customer or to Franchisee in connection with any product or service furnished under this Agreement.

15.     Telephone Service.

(a)  Franchisee acknowledges and agrees that all  published telephone numbers and directory listings for the Center are the property of AAMCO.  Franchisee may not make any changes to the local carrier, service or account name without the prior written authorization of AAMCO.  If AAMCO takes any action pursuant to this section 15, the telephone company and all listing agencies, without liability to Franchisee, may accept this Agreement and the directions by or on behalf of AAMCO as conclusive of the exclusive rights of AAMCO in such telephone numbers and directory listings and its authority to direct their amendment, termination or transfer.

(b)  AAMCO may transfer, suspend or remove Franchisee's telephone service for any published telephone numbers appearing under the AAMCO trade name or trademarks in directory listings, advertising and yellow pages advertising in the event of (i) termination, rejection, expiration or rescission of this Agreement or (ii) an uncured breach of section 8(a), 8(b), 8(i), 8(j), 8(l) or 8(o) of this Agreement, or a breach of AAMCO's credit policy as established by AAMCO.

16.     National Fleet Accounts Program.

AAMCO, as part of the System, maintains a national fleet accounts program by which transmissions and other automotive repairs are provided to national or regional fleet accounts at designated AAMCO Centers, at agreed prices and processed through a centralized billing system ("national fleet accounts program").  If Franchisee decides to participate in AAMCO's national fleet accounts program, then Franchisee specifically agrees to accept and perform any automotive repair work that the vehicle may require in accordance with AAMCO's service standards, offer and honor such warranties as are required under AAMCO's agreement with the fleet account, charge and accept payment for all repairs in accordance with the price agreed between AAMCO and the fleet account for the particular type of repair, complete and provide such data, reports and/or documentation as AAMCO may require in administering the national fleet accounts program, and purchase and/or subscribe to any necessary hardware or software to interface with AAMCO's centralized billing system.  Franchisee agrees that AAMCO retains all rights to the software used in connection with the national fleet accounts program.

17.     Defaults in Payment and Expenses.

(a)  Franchisee agrees to pay all third party costs (and in-house attorneys fees if a court proceeding is instituted) incurred by AAMCO in collecting franchise fees, advertising fees and all other payments due under this Agreement and in enforcing the provisions of this Agreement.

(b)  Franchisee agrees to pay AAMCO a late charge upon all amounts due and owing to AAMCO in an amount equal to one and one-half percent (1-1/2%) of the average unpaid balance per month.  If a court of competent jurisdiction determines that the late charge violates any usury or similar law, then the late charge will, instead, be the maximum amount allowed under applicable law.  In addition, for each gross weekly business report not received by AAMCO within two (2) weeks from the date on which it was due, Franchisee agrees to pay AAMCO a late charge of ten dollars ($10.00) per report, per week.  The payment of any such late charge will not be deemed to allow or excuse delay in payment of sums due.

(c)  Franchisee agrees that he is responsible for paying all service charges and other fees resulting from Franchisee's financial institution in connection with EFT including, without limitation, any and all service charges and other fees arising in connection with any  EFT by AAMCO that is not honored or processed by Franchisee's financial institution for any reason.  Further, Franchisee shall pay AAMCO a fifty dollar ($50.00) charge for reprocessing any EFT not originally honored or processed by Franchisee's financial institution.

(d)  If a local advertising group or pool becomes entitled to recover, by virtue of such an action pursuant to section 11 of this Agreement, then Franchisee acknowledges that such group or pool shall be entitled to recover, in addition to any judgment, an amount equal to the costs and reasonable attorneys' fees therefor.  Franchisee specifically agrees that AAMCO may bring an action on behalf of National Creative Committee to collect amounts due pursuant to section 11.1.

(e)  If Franchisee fails to pay for National Creative Advertising and/or Yellow Pages advertising, then Franchisee acknowledges and agrees that AAMCO has the right (1) to direct any publisher of a Yellow Pages advertising directory to omit Franchisee's listing from such directory and (2) to withhold all television and radio tapes from Franchisee, until all sums owed plus interest and any costs of collection, including attorneys' fees, have been paid in full.

**18.1     Restrictions on Change of Ownership.**

(a)  Franchisee agrees that all rights, interests and obligations of Franchisee arising from or under this Agreement are personal to Franchisee and, except as otherwise provided in this section 18, Franchisee shall not, without AAMCO's prior written consent, voluntarily or involuntarily, by operation of law or otherwise, sell, assign, transfer or encumber his interest in this Agreement, and/or in the franchise granted hereby, or in the lease for the premises at which the Center is located.

(b)  If Franchisee, as an individual, desires to form a corporation, partnership or a limited liability company ("entity") for the operation of the AAMCO Center and to have rights under this Agreement, he may do so only upon the following terms and conditions:

(1)  Franchisee's name remains on the Agreement and the entity is added as a co-franchisee on the Agreement.

(2)  The entity is newly organized and its activities are confined exclusively to acting as an AAMCO franchisee under this Agreement.

(3)  Franchisee continues to devote his best efforts to the day-to-day operation and development of the franchise and the business of the Center.

(4)  Franchisee is the owner of the majority of the stock, partnership interests or membership units of the entity, is the principal executive officer of the entity and has full and complete authority to act for the entity.  In the event of the death of Franchisee who is the majority shareholder, partner or member of such entity, then the provisions of section 18.2 below will apply, except that such heir or next of kin must hold a majority interest in the entity, be a principal executive officer of the entity and must have full and complete authority to act for the entity.

(5)  All money obligations of Franchisee under this Agreement must be satisfied.

(6)  The entity executes a document with AAMCO in such form as shall be approved by AAMCO in which it agrees to be a party to, be bound by all the provisions of this Agreement.

(7)  Franchisee remains personally liable in all respects under this Agreement and Franchisee and all officers, directors, shareholders, partners, and/or members of the entity with at least a twenty-five percent (25%) interest execute in form approved by AAMCO a personal guaranty and agreement not to further transfer the stock, partnership interests or membership units, except as otherwise provided for herein.

(8)  The entity shall disclose in writing the names and addresses of all of its officers and directors, partners or members and, whenever there is a change in any such officer, director, partner or member, shall immediately notify AAMCO of such change.  Franchisee acknowledges that AAMCO has the right to approve the officers, directors, partners and members, which approval shall not be unreasonably withheld, and agrees that any such individual not approved by AAMCO will be immediately removed from such position and shall not be permitted to have any involvement in the operation of the entity or the AAMCO Center.

(c)  If Franchisee organizes or has organized a corporation, partnership or limited liability company in connection with the operation of the Center, the shares of stock, partnership interests or membership units shall not be sold, assigned, pledged, mortgaged or transferred without the prior written consent of AAMCO.  There may be a sale of all of the shares of stock, partnership interests or membership units of the entity subject to the same conditions listed in subparagraph (b) above to a purchaser, as though the person acquiring were a purchaser under section 18.2 of this Agreement.  All ownership certificates shall have endorsed upon them the following:

The transfer of this stock (or membership unit) is subject to the terms and conditions of a Franchise

Agreement dated Dec. 10 , 2007, between AAMCO Transmissions, Inc. and ISMAIL S. LATI

(d)  Franchisee agrees that this Agreement may not be transferred by a corporation, partnership or limited liability company by transfer of stock, partnership interests, membership units or by any other means.

**18.2    Sale, Assignment or Transfer.**

(a)    If Franchisee, or Franchisee's personal representative in case of Franchisee's death or incapacity, desires to sell his Center and receives from a third-party a bona fide written offer to purchase the Center, and obtain a transfer of the franchise under this Agreement, or if Franchisee desires to sell the stock, interests or units of any entity to which the Center has been transferred pursuant to this Agreement, Franchisee agrees to give AAMCO written notice and a copy of such offer and AAMCO shall have the option, exercisable within thirty (30) days after receipt of such notice, to purchase such Center, or stock, interests or units, including the lease, on the same terms and conditions as offered by the third party provided that AAMCO may substitute equivalent cash for any form of payment offered by the third party; provided, however, that this option shall not be available to AAMCO if the offer to purchase is from Franchisee's partner or immediate family member, or a Center employee.  If AAMCO does not exercise its option and if such third party is of good character, reputation and financial condition and acceptable to AAMCO, Franchisee shall have the right for a period of ninety (90) days after the expiration of AAMCO's option period to accept the offer and to sell the Center to such third party, subject to the provisions of section 18.2(c) below;

(b)    If Franchisee dies and his personal representative does not desire to sell the Center, and if under controlling local law, the deceased Franchisee's interests in the Center, and this Agreement are distributable to heirs or legatees who are members of his immediate family and who otherwise would qualify as assignees under the terms of this section, then such attempted assignment by operation of law shall not be deemed in violation of this Agreement, provided that such heirs or legatees accept and fulfill the conditions imposed in section 18.2(c).

(c)    If Franchisee desires to sell his AAMCO Center, he may do so provided that the purchaser is first approved by AAMCO.  AAMCO agrees to approve such prospective purchaser if his credit ratings are satisfactory, he has good moral character and has a reputation and business qualifications satisfactory to AAMCO, and provided further that:

(1) all prior, ascertained or liquidated debts of Franchisee in connection with the Center, including all sums due under the Franchise Agreement, specifically without limitation sums owed for franchise fees, local, regional, national, national creative or yellow page advertising, sums owed to an advertising agency, sums due other AAMCO Centers and any amounts due because of a default of any provision of this Agreement are paid concurrently with the assignment, sale or transfer;

(2) all warranty, intershop and customer service obligations of Franchisee in connection with the Center are assumed by assignee, buyer or transferee;

(3) Franchisee is not subject to an uncured notice of default under this Agreement and all monetary obligations to AAMCO or the applicable advertising pool are satisfied prior to or upon a sale, assignment or transfer;

(4) the assignee, buyer or transferee, prior to the effective date of the assignment, sale, or transfer, satisfactorily completes the AAMCO training program required of new franchisees;

(5) the assignee, buyer or transferee executes AAMCO's then current standard franchise agreement for a full fifteen-year term;

(6) Franchisee, assignee, buyer or transferee, prior to the assignment, sale or transfer, pays to AAMCO its then current training fee and franchise issuance fee of six thousand dollars ($6,000) in connection with the administration and approval of such assignment, sale and issuance of a franchise to such assignee, buyer or transferee; and

(7) Franchisee and all shareholders, partners, members or other person or persons having control of a corporate or similar entity shall execute a general release under seal of all Claims in favor of AAMCO and a termination of franchise.

(d)    If Franchisee sells his AAMCO Center without the aid or assistance of AAMCO then the purchaser must sign a current form of franchise agreement.  The purchaser has the option of signing an agreement for only the balance of Franchisee's term at the franchise fee being paid by Franchisee, or, of signing an agreement for a fifteen (15) year term, the first portion of the term will be for the balance of Franchisee's term at the franchise fee being paid by Franchisee, and the second portion of the term will be for the remainder of the fifteen (15) year term at the franchise fee being charged by AAMCO for new franchises as of the time of the purchase.

(e) If Franchisee has listed his Center with AAMCO or the purchaser has received a presentation from AAMCO's franchise sales department within the past 12 months, then the purchaser must sign a current form of franchise agreement for a fifteen (15) year term at the franchise fee being charged by AAMCO for new franchises as of the time of the purchase.

**18.3    Attempted Sale, Assignment or Transfer**.  If Franchisee attempts to sell, assign or transfer his AAMCO Center without following the procedures required by this Agreement, then any such attempted sale, assignment or transfer is void.  In the event that such attempted assignment or transfer is to an entity wholly or partially owned or controlled by Franchisee, then, at AAMCO's option, Franchisee agrees on behalf of the entity that the attempted assignment or transfer shall subject the entity to all the terms and conditions of this Agreement.  Franchisee shall remain jointly and severally liable for all obligations and responsibilities of this Agreement, including money owed, despite any such attempted and/or unauthorized sale, assignment or transfer of Franchisee's AAMCO Center.

**19.1    Termination.**

(a)  AAMCO, at is option, and without prejudice to any other rights or remedies which it may have under this Agreement, at law or in equity, may terminate this Agreement by giving written notice to Franchisee upon the occurrence of any of the following:

(1) if Franchisee fails to complete the initial training program to AAMCO's satisfaction, this Agreement will be terminated immediately; or

(2) if Franchisee is delinquent in the payment of the franchise fee or any advertising fee or sum, or any other payment due AAMCO or under this Agreement;

(3) if Franchisee shall be adjudicated a bankrupt or declared insolvent; if a temporary or permanent receiver of his property or any part thereof is appointed by a court of competent authority; if he makes a general assignment for the benefit of his creditors; if execution is levied against his business or property; if Franchisee abandons the Center or ceases its operation for a period of more than five (5) consecutive business days;

(4) if Franchisee sells or attempts to sell, transfer or assign his rights in the Center and/or under this Agreement without the approval of AAMCO as required by this Agreement;

(5) if Franchisee terminates or attempts to terminate or rescind this Agreement for any reason;

(6) if Franchisee fails to make any payments to an advertising agency and/or a local advertising group or pool or to make any other advertising payment required by section 11 of this Agreement;

(7) if Franchisee defaults in the performance of any of the other terms, conditions and obligations of this Agreement or of his lease for the premises at which the Center is located.

(8) if, Franchisee breaches paragraph 8(a) or 8(c).

(b)  Upon receipt of notice pursuant to section 19.1(a), Franchisee shall have ten (10) days within which to cure completely any default based on a failure to make any payment required under any provision of this Agreement.  For any other default, except as set forth below in sections 19.1(c) and (d), Franchisee shall have thirty (30) days within which to cure completely any such default.  Failure of Franchisee to effect such cure within the cure period shall result in the immediate termination.  It shall be Franchisee's responsibility to advise AAMCO of his attempt to cure any default.

(c)  Notwithstanding anything contained herein to the contrary, AAMCO shall not be required to give Franchisee notice in the case of a default under this Agreement or to afford Franchisee any period within which to cure the default, if within twelve (12) months immediately preceding the occurrence of such default, Franchisee has been given notice of the same default under Section 8(a); 8(b); 8(i); 8(j); 8(l) or 8(o) of this Agreement or notice of failure to pay any sum under this Agreement when due on three (3) prior occasions, whether or not such default has been cured.  In such event, AAMCO may terminate this Agreement immediately and without prior notice of such default.

(d)   Any notice of termination which is based, in whole or in part, upon the fraudulent acts of Franchisee or on Franchisee's failure to deal honestly and fairly with AAMCO or with any customer of the Center or upon a breach of section 8.1(a) or (c), shall be effective upon receipt by Franchisee, and the provisions of section 19.1(b) shall not be applicable thereto.

(e) If there are now, or hereafter shall be, other franchise agreements and/or notes, security agreements, other debt instruments, or other agreements in effect between AAMCO and Franchisee, a default by Franchisee under the terms and conditions of this or any other of such agreements shall, at the option of AAMCO, constitute a default under all such agreements.

**19.2      Effect of and Procedures after Termination.**

(a) Franchisee agrees that upon the termination or expiration of this Agreement for any reason, including, without limitation, termination upon the expiration of its current term by virtue of Franchisee's failure to renew as provided in section 3 (sometimes herein "expiration"), Franchisee shall cease to be an AAMCO franchisee and shall:

(1) promptly pay AAMCO all amounts due and owing under this Agreement;

(2) immediately and permanently discontinue the use of all AAMCO names and marks, signs, structures, all forms of advertising, telephone listings and service, manuals, software and all materials and products of any kind which are identified or associated with the System or AAMCO and return all such materials and products, including without limitation, the Operator's Manual, to AAMCO;

(3) thereafter make no representations or statements for commercial benefit that Franchisee is or ever was in any way approved, endorsed, associated or identified with AAMCO or the System in any manner whatsoever or that Franchisee is a former AAMCO franchisee; provided, however, Franchisee shall honor all customer complaints made within the applicable warranty period arising from work performed at the Center;

(4) immediately take all steps necessary to amend or terminate any registration or filing of any fictitious name or any other registration or filing containing the AAMCO names and marks in order to effectuate the removal of the AAMCO names and marks from such registration or filing; and

(5) thereafter refrain from establishing any HTML or other link between any web site created, maintained or used by Franchisee and AAMCO's home pages(s) or other part of its web site(s).

(b)  Upon termination or expiration, AAMCO shall have the option to purchase all of Franchisee's right, title and interest in the Center and all equipment contained therein.  If AAMCO intends to exercise its option, AAMCO shall notify Franchisee of such intention within ten (10) days of the time of termination or in the case of expiration, within ten (10) days prior to the expiration of the current term of this Agreement. The full purchase price of the Center shall be:

(1) in the case of expiration, the fair market value of the equipment and parts then located at the Center less all outstanding liabilities of the Center;

(2) in the case of all other terminations, the lesser of the fair market value of the equipment and parts then located at the Center or Franchisee's cost, less depreciation on the equipment computed on a fifteen (15) year straight line basis, less all outstanding liabilities of the Center.  AAMCO shall have the right to withhold from the purchase price funds sufficient to pay all outstanding debts and liabilities of the Center and to pay such debts and liabilities from such funds. If such liabilities exceed the purchase price of the equipment and parts, AAMCO shall apply the purchase price in such manner as AAMCO, in its sole discretion, shall determine.  In no event, however, shall AAMCO become liable for any of the debts and liabilities of Franchisee or the Center and Franchisee shall remain responsible for all outstanding debts and liabilities of the Center which remain unsatisfied subsequent to the distribution by AAMCO of the purchase price funds;

(3) "Fair Market Value" as used in this section 19.2, shall be determined by an appraisal from an independent third party acceptable to both AAMCO and Franchisee, the costs of which shall be borne equally by AAMCO and Franchisee.

(c) If, within five (5) days after termination or expiration, Franchisee fails to remove all displays of the AAMCO names and marks and any other materials of any kind from the Center which are identified or associated with

the System or AAMCO, AAMCO may enter the Center or premises to effect such removal.  In such event, AAMCO shall have no liability to Franchisee therefor, nor shall AAMCO be accountable or required to pay for such displays or materials.

(d) If, within three (3) days after termination or expiration, Franchisee has not taken all steps necessary to amend, transfer or terminate telephone listings and service, any registration or filing of any fictitious name or any other registration or filing containing the AAMCO names and marks, Franchisee hereby irrevocably nominates, constitutes and appoints AAMCO or any prothonotary, clerk of court, or attorney of any court of record as his true and lawful attorney for him and in his name and on his behalf to take all such action as may be necessary to amend, transfer or terminate all such telephone listings and service, registrations and filings of such fictitious name or any other registration or filing containing the AAMCO names and marks, without liability to Franchisee for so doing.  If any action is required to be taken by or on behalf of AAMCO pursuant to this subsection 19.2(d), the telephone company and all listing agencies and publishers, without liability to Franchisee, may accept this Agreement and the directions by or on behalf of AAMCO as conclusive of the exclusive rights of AAMCO in such telephone numbers and directory listings and its authority to direct their amendment, termination or transfer and Franchisee hereby releases and waives any claim of any kind that he may have against any telephone company, publisher or listing agency as a result of their implementing the transfer, amendment or termination set forth herein.

(e) Termination of this Agreement shall not affect, modify or discharge any claims, rights, causes of action or remedies, which AAMCO may have against Franchisee, whether under this Agreement or otherwise, for any reason whatsoever, whether such claims or rights arise before or after termination.

(f) Franchisee hereby irrevocably authorizes AAMCO to enter upon and take possession of the Center and to take, in the name of Franchisee, all other actions necessary to effect the provisions of this section, and any such entry or other action shall not be deemed a trespass or other illegal act, and AAMCO shall not be liable in any manner to Franchisee for so doing.

**20.    Covenant Not-to-Compete.**  Franchisee acknowledges that as a franchisee of AAMCO and a participant in the System, Franchisee will receive or have access to confidential information and materials, trade secrets, and the unique methods, procedures and techniques developed by AAMCO.  Franchisee further acknowledges that the development of the marketplace in which his Center is located is solely as a result of the AAMCO name and marks. Therefore, to protect the System, the AAMCO name and marks and AAMCO, and to induce AAMCO to grant Franchisee the franchise set forth in this Agreement, Franchisee represents and warrants:

(a) Except for the business contemplated by this Agreement or except as approved by AAMCO pursuant to section 8(e) above, during the term of this Agreement, Franchisee shall not engage in any business the same as, similar to, or in competition with any Center, AAMCO or the System.

(b) For a period of two (2) years after the termination of this Agreement for any reason, which two-year period shall not begin to run until Franchisee commences to comply with all obligations stated in this section 20, Franchisee shall not:

(1) within a radius of ten (10) miles of Franchisee's former Center and ten (10) miles of any other Center in operation at the time of termination or any Center that has commenced operation during the two-year period, begin or engage in any business the same as, similar to or in competition with such Center, except for a business previously approved by AAMCO pursuant to section 8(e); or

(2) within the territorial boundaries of the United States, Canada, Puerto Rico, Australia, and the Virgin Islands, as a licensor, franchisor, or similar organization, engage in any business, the same, similar to, or in competition with, AAMCO or the System, except for a business previously approved by AAMCO pursuant to section 8(e) above.

(c) As used in subsections 20(a) and 20(b) above:

(1) "engage in" shall include, but not be limited to, activities, whether direct or indirect, as an individual proprietor, partner, shareholder, director, officer, principal, broker, agent, employee, consultant, lender, unless such activities are directly as a result of the sale of the AAMCO Center pursuant to this Agreement; and

(2) "in competition with" shall include, but not be limited to:

(i) the request of any present or future supplier, customer or operator of a Center to curtail or cancel its business relationship with any Center, AAMCO or the System, (ii) the disclosure of the identity of

any past, present or future customer, supplier or operator of any Center, and (iii) the solicitation, canvassing or the authorization of any other person to solicit or canvass any past, present or future customer, supplier or operator of a Center.  As used in this section 20(c)(2), "future supplier, customer or operator" shall mean a supplier, customer, or operator who will have had a business relationship with a Center, AAMCO or the System during the term of this Agreement or during a period of one (1) year following the termination of this Agreement.

(d) Franchisee acknowledges that, in view of the nature of the System, the business of AAMCO, and the strength of the AAMCO names and marks, the restrictions contained in this section 20 are reasonable and necessary to protect the legitimate interests of the System and AAMCO and that any violation of such restrictions will result in irreparable injury to the System or AAMCO.  Therefore, Franchisee acknowledges that, in the event of such violation, AAMCO shall be entitled to preliminary and permanent injunctive relief and damages as well as an equitable accounting of all earnings, profits, and other benefits arising from such violation, which remedies shall be cumulative and in addition to any other rights or remedies to which AAMCO shall be entitled, and the arbitration provision of section 28 shall not apply to any equitable proceeding seeking enforcement of the provisions of this section 20. If Franchisee violates any restriction contained in this section 20, and it is necessary for AAMCO to seek equitable relief, the restrictions contained herein shall remain in effect until two (2) years after such relief is granted.

(e) Franchisee agrees that the provisions of this covenant not-to-compete are reasonable.  If, however, any court should hold that the duration or geographical limits of any restriction contained in this section 20 are unreasonable, the parties agree that such determination shall not render the restriction invalid or unenforceable, but that such restriction shall remain in full force and effect for such duration and within such geographical limits as the court shall consider reasonable.

### 21.   No Waiver.

Waiver by AAMCO or Franchisee of any violation or default under this Agreement shall not alter or impair either party's right with respect to any subsequent violation or default nor shall any delay or omission on the part of either party to exercise any right arising from such violation or default alter or impair such party's rights as to the same or any future violation or default.  An acceptance by AAMCO of any payment from Franchisee after the date on which such payment is due shall not operate as a waiver of Franchisee's default or violation hereunder nor alter or impair AAMCO's rights with respect to such violation or default.

### 22.   Successors.

Except as otherwise specifically set forth in this Agreement, this Agreement shall inure to and be binding upon the parties hereto, their respective heirs, executors, administrators, successors and assigns.  AAMCO shall have the right to assign its rights, interests and obligations under this Agreement, provided that the assignee shall agree in writing to assume all obligations undertaken by AAMCO under this Agreement.

### 23.   Notice.

Whenever this Agreement requires notice, it shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by a recognized overnight carrier addressed to the party to whom it is directed at the address set forth above or at such other address as one party shall provide to the other in writing. All notices shall be effective three (3) business days after being deposited, postage prepaid, or upon the date of actual receipt or rejection, whichever shall occur first.

### 24.   Risk of Operations.

Franchisee acknowledges that there are uncertainties inherent in all business ventures.  Franchisee acknowledges that he has conducted a thorough and independent investigation and, based on that investigation, desires to enter into this Agreement and undertake the business of owning and operating an AAMCO Center.  Franchisee agrees and acknowledges that, except as specifically set forth in this Agreement, no representations or warranties, express or implied have been made to Franchisee, either by AAMCO or anyone acting on its behalf or purporting to represent it, including, without limitation any such representations or warranties relating to the prospects for successful operations, the level of business, sales or profits that Franchisee might reasonably expect, the desirability, profitability or expected traffic volume or profit of the Center (whether or not AAMCO assisted Franchisee in the selection of the location of the Center), the costs of equipping or the amount or type of equipment necessary or appropriate to the operation of the Center or as to the quality of any products or services to be sold by Franchisee to its customers.  Franchisee acknowledges that all such factors are necessarily dependent upon variables beyond AAMCO's control, including without limitation, the ability, motivation and amount and quality of effort expended by Franchisee.

New 07_01_(8)                                        19

25.     **Severability.**

If any portion, term or provision of any section of this Agreement shall be decided by any court to be in conflict with the law of any state or jurisdiction, the conflicting term or provision shall be construed in accordance with the specific provisions of the applicable law, and the remaining portions, terms or provisions of the section, as well as the remainder of this Agreement, shall remain in full force and effect.

26.     **Jurisdiction, Venue and Controlling Law.**

26.1    This Agreement and all related agreements have been entered into in the Commonwealth of Pennsylvania and any matter whatsoever which arises out of or is connected in any way with the Agreement or the franchise granted shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania.

26.2    With respect to any legal proceedings arising out of or connected in any way to this Agreement or the franchise, Franchisee and AAMCO consent to the jurisdiction and venue of any court of general jurisdiction of Montgomery County, Pennsylvania or the United States District Court for the Eastern District of Pennsylvania, and any legal proceedings arising out of this Agreement shall be brought only in such courts and not in any other courts. The parties further agree that the mailing by certified or registered mail, return receipt requested or by an overnight carrier service that provides a receipt to such party's last known address of any process shall constitute lawful and valid process.

26.3    In any court proceeding brought by either party arising out of or based upon this Agreement or its performance, the prevailing party shall recover all court costs, attorneys' fees and other expenses relating to such proceeding from the non-prevailing party.

27.     **JURY WAIVER.**

FRANCHISEE AND AAMCO HEREBY AGREE THAT THEY SHALL AND HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM, OR IN ANY MATTER WHATSOEVER WHICH ARISES OUT OF OR IS CONNECTED IN ANY WAY WITH THIS AGREEMENT OR ITS PERFORMANCE.

28.     **Mediation and Arbitration.**

(a) Non-binding mediation of disputes, controversies or claims arising out of or related to this Agreement shall be conducted, solely at Franchisee's option, in Philadelphia, Pennsylvania, Chicago, Illinois or Bethesda, Maryland in accordance with established procedures.

(b) All disputes, controversies or claims arising out of or relating to this Agreement shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association or its successor, except for termination by AAMCO which is based, in whole or in part, upon the fraudulent acts of Franchisee or Franchisee's failure to deal honestly and fairly with any customer of the Center or Franchisee's failure to accurately report his gross receipts to AAMCO or actions for equitable relief related to the uncured misuse of proprietary marks, confidential information or other intellectual property of AAMCO or Franchisee's non-compliance with the covenant not-to-compete. Arbitration shall be conducted in Philadelphia, Pennsylvania, unless otherwise agreed to by the parties. The decision of the Arbitrator shall be final and binding on the parties and judgment upon the award may be entered in any court having jurisdiction. Each party shall be responsible for the payment of his or its legal expenses and the fees and expenses of arbitration except that the fee of the Arbitrator shall be paid by the non-prevailing party. The Arbitrator shall have no authority to alter or modify any provision of this Agreement or to render an award which by its terms results in such an alteration or modification. The parties specifically acknowledge and agree that no class action and multiparty claims shall be filed in any such arbitration proceeding pursuant to the terms of this Agreement.

29.     **Entire Agreement.**

This Agreement contains the entire agreement of the parties, and supersedes, cancels, and revokes any and all other agreements between the parties relating to the subject matter of this Agreement. There are no representations, warranties, promises or inducements, either oral or written, except those contained in this Agreement.

Except as set forth in section 7.1, this Agreement may be modified only by an agreement in writing signed by the party against whom enforcement of such modification is sought.

      **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement under seal on the date first above written.

ATTEST:

AAMCO Transmissions, Inc.

BY: _____ (Seal)

    Todd P. Leff, President

Witness:

Franchisee:

_____ (Seal)

    ISMAIL S. LATIF

Witness:

Franchisee:

_____ (Seal)

Witness:

Franchisee:

_____ (Seal)

New 07_01_(8)

21

## AMENDMENT TO FRANCHISE AGREEMENT

WHEREAS, Ismail S. Latif has entered into a Franchise Agreement with AAMCO Transmissions, Inc. dated December 10, 2007 and;

WHEREAS, all parties to the Franchise Agreement wish to amend paragraph 1.2 of said Agreement.

NOW THEREFORE, for good and valuable considerations it is hereby agreed:

(1)     That the following words in paragraph 1.2 shall be deleted:

West Virginia

(2)     That the following words shall be substituted for the aforesaid deleted words and shall be added to Paragraph 1.2:

411 Suncrest Towne Centre Drive, Morgantown, WV 26505

IN WITNESS WHEREOF, the parties intending to be legally bound hereby, hereto have set their hands and seals this _____8th_____ day of February, 2012.

ATTEST:                                          AAMCO TRANSMISSIONS, INC.

_____            By:_____
Assistant Secretary                              Marc Graham, President

_____            _____
Witness                                            Franchisee – Ismail S. Latif

**Electronic Debit Authorization**

**(Authorization Agreement for Pre-Authorized Payments
via EFT Debit Originations)**

COMPANY NAME: _BREEZEBAY_____ CENTER #: _15990_____
_____INTERNATIONAL LLC_

I (We) hereby authorize AAMCO Transmissions, Inc., hereinafter called COMPANY, to
initiate debit entries to my (our) checking account indicated below in the depository
named below, hereinafter called DEPOSITORY, to debit the same to such account.

NAME OF DEPOSITORY: _HUNTINGTON  BANK_____

CITY & STATE: _MORGANTOWN, WV_____

ABA/TRANSIT NO: _051903761_____ ACCOUNT NO: _01191204594_

This authorization is to remain in full force and effect until the underlying obligations per
the License Agreement have been satisfied in full or released in writing by COMPANY.

This authorization further confirms my understanding of the Addendum to License
Agreement signed by me/us in which I/we expressly agree that this authorization shall
apply to any and all Depositories and Bank accounts with which I/we open accounts
during the term of the License Agreement and any renewals. Without limiting the
generality of the foregoing, I/we understand that if I/we close any bank account, I/we are
obligated to immediately, (i) notify COMPANY thereof in writing, (ii) establish another
bank account, and (iii) execute and deliver to COMPANY all documents necessary for
COMPANY to begin and continue making withdrawals from such depository /bank
account by ACH debiting or other electronic means. I/we specifically agree and declare
that this Authorization shall be the only written authorization needed from me/us in order
to initiate debit entries/ACH debit originations to my/our bank account(s) established
with any Depository in the future.

NAME(S): _ISMAIL S. LATIF_ SS# OR EIN: _27-4445448_
        (PLEASE PRINT)

_____ SS#: _____
        (PLEASE PRINT)

DATE: _2|08|2012_____ SIGNATURE: _Ismail S. Latif_
                                  Ismail S. Latif

## Telephone Number Use Agreement



Date: February   , 2012

I acknowledge that the telephone numbers listed below (and any others that may be subsequently published for my AAMCO Center) are the property of AAMCO Transmissions, Inc. ("ATI") or its designee, American Driveline Communications Corp.  I also acknowledge that such numbers are assigned for use at my AAMCO Center located at 411 Suncrest Towne Centre Drive, Morgantown, WV 26505, during the term of my AAMCO Franchise Agreement:

304-296-0056

and any published telephone number under the "AAMCO" name or trademark.

I acknowledge that such telephone numbers published for my AAMCO Center will appear under AAMCO's trade name or trademark in directory listings, advertising and yellow pages advertising.  I further acknowledge that ATI or its designee may transfer, suspend or remove such telephone numbers in the event of (a) termination, rejection, expiration or rescission of my AAMCO Franchise Agreement, or (b) an uncured breach of any of the following sections of my AAMCO Franchise Agreement: Section 8(a); 8(b); 8(i); 8(j); 8(l) or 8(o), or a breach of AAMCO's Credit policy as established by AAMCO.

I acknowledge that I may not make any service order changes to these numbers including, but not limited to change of authorized parties, change of local providers, and termination or transfer of such telephones, and that any such attempted changes to the account shall be null and void.

Franchisee – Ismail S. Latif


American Driveline Communications Corp.

By:

Marc Graham, President

TO:    AAMCO Transmissions, Inc.
       201 Gibraltar Road
       Horsham, PA  19044

I hereby subscribe to the AAMCO Tech Video Library.  I agree to purchase all tapes/DVD's in the current library.  Furthermore, I agree to purchase new tapes/DVD's as they are made available and to pay for them at approximately $45.00 per tape/DVD.  I also agree to continue this subscription for the duration of my franchise unless I decide to participate in a comparable technical training program which meets AAMCO's specifications, at which time this subscription shall be ended.

*Ismail S. Latif*

**Franchisee – Ismail S. Latif**

**Dated:  December 10, 2007**

## AAMCO FOCUS™ USER LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is entered into as of the Effective Date (as defined on the signature page hereto) by and between AAMCO TRANSMISSIONS, INC. ("ATI"), and:

Franchisee: <u>Ismail S. Latif</u>                          Center #/City & State:  <u>15990/Morgantown, WV</u>

WHEREAS, Franchisee desires delivery of an **AAMCO FOCUS™** System (the "System") consisting of textual works and computer programs recorded on one or more CD-ROM discs.  The System will, among other things, permit Franchisee to print repair orders, calculate, print and transmit weekly business reports, market to customers and prepare reports analyzing the operation of his business under the conditions set forth in this Agreement.

NOW, THEREFORE, for valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

**1. Term.**  The term of this Agreement shall commence upon the Effective Date and shall remain in full force and effect indefinitely unless terminated in accordance with this Agreement.  Termination of this Agreement shall not terminate Franchisee's obligations under the provisions of this Agreement.

**2. License.**  Subject to the terms and conditions of this Agreement, ATI grants to Franchisee a nonexclusive and nontransferable license to use the System.  ATI shall retain title at all times to the System, and Franchisee shall have no rights therein except to use the System as set forth herein.  The System may be used solely (i) by Franchisee, (ii) for the operation of his AAMCO center (iii) at the location listed above.

**3. Sole User.**  Franchisee may not sell, market or in any other manner distribute System to any third party, or to any location, except in connection with an approved AAMCO Center Resale.

**4. Updates.**  ATI may update the content of the System data ("Data Updates") from time to time during each year and may also release major base system enhancements.  Franchisee shall not be charged any amount for the Data Updates or major base system enhancements over and above the Maintenance and Support Subscription Fee.

**5. Price and Payment Terms.**  In consideration of the license granted herein, Franchisee shall pay to ATI the License Fee and the annual Maintenance and Support Subscription Fee set forth on the User Price Schedule.  The prices do not include shipping, sales, use, excise, or other similar taxes, all of which are the obligation of Franchisee.  The Maintenance and Support Subscription Fees may be changed annually, but will not change by more than 10% in any 2 year period.

### USER PRICE SCHEDULE (US$)

License Fee Base Price..........................   $1,995.00

\*  Annual Subscription Support and Maintenance Fee ................................   $  495.00

Franchisee agrees that he will continue to mail ATI the weekly business report data until instructed otherwise.

**6. Maintenance of Equipment and Software.**  Franchisee, and not ATI, shall bear sole responsibility to obtain, maintain and operate, or cause to be obtained, maintain and operated at its own expense, all equipment and non-AAMCO software that may be used in conjunction with the System.

**7. Confidentiality.**  Franchisee acknowledges that the System comprises information which constitutes a trade secret of ATI in which ATI has a proprietary interest.  Franchisee therefore agrees that no portion of the information constituting the System may be disclosed to others, copied, reproduced, compiled or used for any purpose or purposes other than as specifically contemplated by this Agreement in paragraph 2 above.  Franchisee shall exercise its best efforts to protect the System and to prevent its dissemination to unauthorized persons.   Furthermore, Franchisee shall not assign, pledge, sublicense or permit any other use of the System except in connection with an approved AAMCO Center resale.

**8. AAMCO System Modification.**  For all presently foreseeable future updates and enhancements, the System will operate effectively on a Pentium 166 MHz or better PC with 32MB or more memory.  However, ATI reserves the right to make changes in rules of operation, security measures, accessibility, procedures, types of terminal equipment, types of system equipment, system programming languages and any other matters relating to the System and its use, without prior notice.

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH HERE <u>AND</u> ON THE REVERSE OF THIS PAGE.
IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the respective dates indicated below.

Accepted by: AAMCO Transmissions, Inc.

Franchisee Signature: _Ismail S. Latif_

By: _[signature]_

Marc Graham, President

Printed Name: <u>Ismail S. Latif</u>                    Date: <u>12/10/07</u>

Date:_____

**9. Warranty.** THE SYSTEM IS DELIVERED "AS IS" AND ATI MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE SYSTEM OR THE DATA UPDATES, THE COMPUTER PROGRAM ALLOWING USE OF THE SYSTEM, OR ANY SERVICES PERFORMED BY ANY THIRD PARTY. Franchisee acknowledges and agrees that (i) ATI is not the manufacturer or vendor of any automotive repair parts referenced in the System, and that it makes no representations or warranties with respect to the quality or availability of such parts or the accuracy of the prices of such parts. ATI is not responsible for obsolescence of the System and Data Updates, and further is not responsible for suspended, outdated or uncorrected versions of the System and Data Updates.

**10. Limitation of Liability.** Franchisee agrees that ATI shall not be liable to Franchisee for any direct, indirect, special, incidental or consequential damages, including but not limited to loss of data or anticipated profits, in connection with or arising out of the use of the System and Data Updates. Franchisee's sole remedy upon breach of this Agreement by ATI shall be termination of the Agreement and refund of unearned portions of the License Fee. Franchisee agrees to indemnify ATI and hold it harmless against all claims and damages, including without limitation, reasonable attorney's fees arising out of Franchisee's use of the System and the Data Updates, unless such claims or damages result from, or unless Franchisee's authorized use of the System has given rise to, claims or damages based on the infringement of any copyright or other proprietary right of any third party.

**11. Termination.** Immediately upon the termination of this Agreement or the Franchise Agreement, Franchisee shall cease using the System, shall return the System, Data Updates, and all ATI documents and information pertaining thereto, and shall certify to ATI in writing that the System and all ATI documents and information pertaining thereto have been returned. The following actions shall constitute a breach of the Agreement and shall allow ATI to terminate the Agreement: any use or dissemination of the System or Data Updates which is not expressly permitted herein; dissolution or discontinuance of business operations of Franchisee; or failure to make timely payment to ATI of the required fees. Upon termination of this Agreement by ATI for any such cause, Franchisee shall not be entitled to any refund of the License Fee.

**12. General Provisions.**

**12.1 Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and supersedes all prior discussions between them.

**12.2 Attorneys' Fees.** If any action or proceeding is brought in connection with this agreement, the prevailing party shall be entitled to its attorneys' fees and other costs and expenses incurred in such action or proceeding, including any appeals or petitions therefor.

**12.3 Assignment.** Except in connection with an approved AAMCO Center Resale, Franchisee may not assign its rights or delegate its duties hereunder. In the event of such Resale, so long as the outgoing Franchisee is current in his annual Support and Maintenance Subscription, the incoming Franchisee shall merely execute a new license agreement and pay the 1st year maintenance subscription fee. He shall not be required to pay any new License Fee. Any other attempted conveyance shall be void and shall constitute a default entitling ATI to terminate this Agreement. ATI may freely assign its rights without securing Franchisee's permission to do so.

**12.4 ARBITRATION.** All disputes, controversies or claims arising out of or relating to this Agreement shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, or its successor. Arbitration shall be conducted in Philadelphia, Pennsylvania, unless otherwise agreed to by the parties. A judgment upon the award may be entered in any Court having jurisdiction thereof.

**12.5 Choice of Law and Forum.** This Agreement has been entered into under the laws of the Commonwealth of Pennsylvania, the parties hereto agree that it shall be interpreted, and all disputes arising hereunder shall be resolved, in accordance with its laws, and consent to jurisdiction in its courts.

**12.6 Waiver.** Failure of either party hereto to enforce at any time any term of this Agreement shall not be a waiver of that party's right thereafter to enforce each and every term of this Agreement.

## AAMCO DirecTech® USER LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is entered into as of the Effective Date (as defined on the signature page hereto) by and between AAMCO TRANSMISSIONS, INC. ("ATI"), and:

Franchisee: Ismail S. Latif

Address: 411 Suncrest Towne Centre Drive

Center #: 15990

City/State/Zip: Morgantown, WV 26505

WHEREAS, Franchisee desires delivery of an AAMCO DirecTech® System (the "System") consisting of textual works and computer programs recorded on one DVD. The System will permit Franchisee access to service and repair procedures, specifications, schematics and illustrations for the repair of automotive transmissions under the conditions set forth in this Agreement.

NOW, THEREFORE, for valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1. **Term.** The term of this Agreement shall commence upon the effective date and shall remain in full force and effect indefinitely unless terminated in accordance with this Agreement. Termination of this Agreement shall not terminate Franchisee's obligations under the provisions of this Agreement.

2. **License.** Subject to the terms and conditions of this Agreement, ATI grants to Franchisee a nonexclusive and nontransferable license to use the System to access mechanical service and repair for mechanical repairs. ATI, and its vendor, Mitchell Repair Information Company, LLC ("MRIC") shall retain title at all times to the System, and Franchisee shall have no rights therein except to use the System as set forth herein. The System may be used solely (i) by Franchisee, (ii) for the purpose of accessing mechanical service and repair data on the System (iii) at the location listed above.

3. **Sole User:** Franchisee may not sell, market or in any other manner distribute to any third party, or to any location, the System or any information contained in or derived from the System except in connection with an approved AAMCO Center resale; provided, however, the purchaser of such resale shall be required to pay in full the Annual Support Fee in order for such transfer of the System to be effective. Franchisee may not download the System, in whole or in part, to another computer, or transmit the System, in whole or in part, electronically to another computer or terminal, without written authorization from ATI.

4. **Updates.** ATI intends to update all AAMCO content and portions of the MRIC content of the System data ("Data Updates") annually, based upon the reasonable availability of MRIC data. Unless Franchisee declines an Update in writing within 30 days of notice of

Data Update Release, ATI will automatically ship each Data Update to Franchisee and bill the Update Fee to his Parts Account. Should Franchisee seek to update the System after missing any Data Update, Franchisee will pay the full price for the most recent update plus 50% of the price for the first missed update and 25% of the price of previous sequentially missed updates. Upon receipt of replacement DVD, Franchisee agrees to return all previous discs, or, upon request, destroy them.

5. **Price and Payment Terms.** In consideration of the license granted herein, Franchisee shall pay to ATI the License Fee, Annual Support Fee and Data Update Price set forth on the User Price Schedule below. The prices do not include sales, use, excise, or other similar taxes, all of which are the obligation of Franchisee.

The Annual Support Fee and the Data Update Price are subject to a change by up to 15% annually. Major base system enhancements may be priced separately.

### USER PRICE SCHEDULE:

| Payment Options | | Select One |
|---|---|---|
| 1: One Payment - License and Annual Fees | | ☑ |
| * License Fee Base Price…………………… | $1,695.00 | |
| (includes 1st year Annual Support) | | |
| * Annual Support Fee…………… …………. | $  98.00 | |
| * Annual Data Update ……………………… | $ 177.00 | |
| 2: Monthly Payments - $142/month for 1 year | | ☐ |
| *Plus Annual Support Fee $98 and Annual Data Update Fee $177 in years 2 and 3 | | |
| 3: Monthly Payments - $63/month for 3 years | | ☐ |
| * Includes License Fee and two years Annual Fee and Annual Data Update Fee | | |

Note: Options 2 and 3 are subject to credit approval; option 1 applies if none is checked.

6. **Maintenance of Equipment and Software.** Franchisee, and not ATI or MRIC, shall bear sole responsibility to obtain, maintain and operate, or cause to be obtained, maintained and operated at its own expense, all equipment and non-AAMCO software that may be used in conjunction with the System.

THE UNDERSIGNED AGREE TO THE TERMS AND CONDITIONS SET FORTH HERE AND ON THE REVERSE OF THIS PAGE.
IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the respective dates indicated below.

Franchisee Signature: _Ismail S. Latif_

Printed Name: Ismail S. Latif                    Date: 2|08|12

Accepted By: AAMCO Transmissions, Inc.

By: _____

Marc Graham, President   Date:

7. **Confidentiality.** Franchisee acknowledges that the System comprises information which constitutes a trade secret of ATI and MRIC in which ATI and MRIC has a proprietary interest. Franchisee therefore agrees that no portion of the information constituting the System may be disclosed to others, copied, reproduced, compiled or used for any purpose or purposes other than as specifically contemplated by this Agreement in paragraph "2" above. Franchisee shall exercise its best efforts to protect the System and to prevent its dissemination to unauthorized persons. Furthermore, Franchisee shall not assign, pledge, sublicense or permit any other use of the System without obtaining the prior written consent of ATI which consent may be withheld at the sole discretion of ATI. Franchisee shall immediately return to ATI all System discs and other information together with all copies and derivatives thereof immediately upon the termination of this Agreement.

8. **AAMCO System Modification.** For all presently foreseeable future updates and enhancements, the System will operate effectively on a Pentium 233 MHz computer. However, ATI reserves the right to make changes in rules of operation, security measures, accessibility, procedures, types of terminal equipment, types of system equipment, system programming languages and any other matters relating to the System and its use, without prior notice.

9. **Warranty.** THE SYSTEM IS DELIVERED "AS IS" AND NEITHER ATI NOR MRIC MAKE ANY REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE SYSTEM OR THE DATA UPDATES, THE COMPUTER PROGRAM ALLOWING USE OF THE SYSTEM, OR ANY SERVICES PERFORMED BY ANY THIRD PARTY. Franchisee acknowledges and agrees that (i) ATI is not the manufacturer of any automotive repair parts referenced in the System, (ii) ATI hereby makes no representations or warranties with respect to the quality or availability of such parts or the accuracy of the prices of such parts and (iii) if Franchisee utilizes any non-ATI-supplied interface program to interface with the System, Franchisee shall look solely to the vendor of such interface program with respect to any losses or damages caused by such interface program. Neither ATI nor MRIC is responsible for obsolescence of the System and Data Updates and neither is responsible for suspended, outdated or uncorrected versions of the System and Data Updates.

10. **Limitation of Liability.** Franchisee agrees that neither ATI nor MRIC shall be liable to Franchisee for any direct, indirect, special, incidental or consequential damages, including but not limited to loss of anticipated profits, in connection with or arising out of the use of the System and Data Updates. Franchisee's sole remedy upon breach of this Agreement by ATI shall be termination of the Agreement and refund of unearned portions of the License Fee. Franchisee agrees to indemnify ATI and MRIC and hold them harmless against all claims and damages, including without limitation, reasonable attorney's fees arising out of Franchisee's use of the System and the Data Updates, unless such claims or damages result from, or unless Franchisee's authorized use of the System has given rise to, claims or damages based on the infringement of any copyright or other proprietary right of any third party.

11. **Termination.** Immediately upon the effective date of termination of this Agreement or the Franchise Agreement, Franchisee shall cease using the System, shall return the System, Data Updates, and all ATI documents and information pertaining thereto, and shall certify to ATI in writing that the System and all ATI documents and information pertaining thereto have been returned. The following actions shall constitute a breach of the Agreement and shall allow ATI to terminate the Agreement: any use or dissemination of the System or Data Updates which is not expressly permitted herein; the appointment of a receiver to take possession of Franchisee's assets or the institution of liquidation or bankruptcy by or against Franchisee; dissolution or discontinuance of business operations of Franchisee; or failure to make timely payment to ATI of the License Fee. Upon termination of this Agreement by ATI for any such cause, Franchisee shall not be entitled to any refund of the License Fee.

12. **General Provisions.**

12.1 **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and supersedes all prior discussions between them.

12.2 **Attorneys' Fees.** If any action or proceeding is brought in connection with this agreement, the prevailing party shall be entitled to its attorneys' fees and other costs and expenses incurred in such action or proceeding, including any appeals or petitions therefor.

12.3 **Assignment.** Except in connection with an approved AAMCO Center resale, Franchisee may not assign its rights or delegate its duties hereunder without first securing written permission to do so from ATI, which permission may be withheld at the sole discretion of ATI. Any such attempted conveyance shall be void and shall constitute a default entitling ATI to terminate this Agreement. ATI may freely assign its rights without securing Franchisee's permission to do so.

12.4 **ARBITRATION.** All disputes, controversies or claims arising out of or relating to this Agreement shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, or its successor. Arbitration shall be conducted in Philadelphia, Pennsylvania, unless otherwise agreed to by the parties. A judgment upon the award may be entered in any Court having jurisdiction thereof.

12.5 **Choice of Law and Forum.** This Agreement has been entered into under the laws of the Commonwealth of Pennsylvania, the parties hereto agree that it shall be interpreted, and all disputes arising hereunder shall be resolved, in accordance with its laws, and consent to jurisdiction in its courts.

12.6 **Waiver.** Failure of either party hereto to enforce at any time any term of this Agreement shall not be a waiver of that party's right thereafter to enforce each and every term of this Agreement.

Pittsburgh, PA AAMCO Dealers Association
c/o AAMCO Transmissions, Inc.
201 Gibraltar Road
Horsham, Pennsylvania  19044

Gentlemen:

Please accept this letter as evidence of my commitment to the requirement that I, as an AAMCO franchisee, participate in and cooperate with my local advertising pool and program.

A.   I acknowledge that advertising is necessary to the successful operation of my business as an AAMCO dealer.

B.   I acknowledge that advertising by other AAMCO dealers within my marketing area directly benefits my AAMCO center.

C.   I acknowledge the legal, business and other responsibilities to approve, cooperate and participate in the advertising program established by the other AAMCO dealers in my marketing area, as such programs are approved by AAMCO Transmissions, Inc.

D.   I agree that should I be in default of any money due my local AAMCO Dealers Advertising Pool, or should I fail to participate in an advertising program and make payment for it, I shall be subject to a delinquency charge and pay interest at the highest contract rate permitted by law to be computed in addition to my actual billing, plus any legal and attorney's fees incurred in the event suit must be commenced against me because of a violation of this Agreement.

E.   I agree that I will submit any and all information required to administer the local AAMCO dealers advertising program in my area and will submit such information to the group authorized to administer the local advertising program.

F.   It is further agreed and understood by and between me and the Pittsburgh, PA AAMCO Dealers Association that I contract for a period equal to the duration of my Franchise Agreement with AAMCO and any renewals thereof, to participate in and to be responsible for the payment of advertising on this local level as determined by my advertising pool.  I acknowledge that the benefit that I am deriving and will derive from participating in local advertising and my concurrent responsibility for payment of my share of local advertising shall begin at the end of the first week after the actual opening of my AAMCO center.  I further agree to execute any agreements presently in use by said local AAMCO Dealers Advertising Pool.  The amount of payment for such advertising shall be as follows:

1.  Existing percent or flat rate formula, if applicable
2.  Existing minimum weekly contribution              $180.00/week
3.  Existing maximum weekly contribution

G.  I acknowledge that the above amount(s) may be changed by the local AAMCO Dealers Advertising Pool according to its standard procedure and I agree to be bound by any such change(s).

H.  To secure my responsibility to make the necessary payments for an initial period of two (2) years, I hereby agree to execute a Note, secured with the appropriate collateral, and including an acceleration clause for payment in the event of a default, to be paid on a monthly basis to enforce my financial responsibility under the terms of this Agreement. The Note is to be drawn under the appropriate requirements of my local jurisdiction and is to be made in favor of my AAMCO Dealers Advertising Pool. I acknowledge that the two-year period of the Note in no way affects my 15-year obligation under the Franchise Agreement in regard to all aspects of local advertising, including payment therefor. If requested to do so, I further agree to execute additional Notes payable to my local AAMCO Dealers Advertising Pool to secure the remaining years of my local advertising obligation.

I further agree to continue to participate in the local AAMCO Dealers Advertising Pool for the duration of my Franchise Agreement.

Date:___February_, 2012_____          _Ismail S. Latif_____
                                        Franchisee – Ismail S. Latif

                                        AAMCO DEALERS ADVERTISING POOL

                                        By:_____
                                            Authorized Representative

## INSTALLMENT NOTE

$18,720                                                    Dated:  February 8, 2012

      FOR VALUE RECEIVED, I (we) jointly and severally promise to pay to the order of the Pittsburgh, PA AAMCO Dealers Association ("Ad Pool") Eighteen Thousand Seven Hundred Twenty dollars in 104 successive weekly installments of $180.00, the first installment payable at the end of the first week after the date of the opening of Franchisee's AAMCO Transmissions center located at 411 Suncrest Towne Centre Drive, Morgantown, WV 26505.

      The obligation of payment of the above installments when due shall cease as of the date that Franchisee ceases to be an AAMCO Transmissions franchisee and signs the necessary Termination of Franchise and other documents intended to terminate his AAMCO Franchise; provided, however, that the termination of Franchisee's franchise shall not relieve him from any liability for payment of the above installments which may have become due and payable prior to said termination.  So long as I (we) continue to be an AAMCO Transmissions franchisee, at the conclusion of the previous term of 104 weeks, this Installment Note will automatically renew for another term of 104 weeks, during which I (we) promise to pay to the order of Ad Pool 104 successive weekly installments in the amount of the last weekly advertising assessment that was to be paid and was due from me (us) prior to the expiration of the previous 104 week term of this Installment Note.

      PROTEST WAIVED.  On non-payment of any installment when due, all remaining installments in the current 104 week term of this Installment Note shall, at the option of the holder, become immediately due and payable.  I (we) agree to pay if this note is placed in the hands of an attorney for collection, a reasonable attorney's fee of 18% of the amount due and owing on the defaulted note.  And to secure the payment of that amount I (we) hereby authorize, irrevocably, the Prothonotary, Clerk of Court, or any Attorney of any Court of Record to appear for me (us) in such Court, term time, or vacation, at any time before or after maturity and confess judgment, or a series of judgments, without process in favor of any holder of this note, with or without the filing of an Averment or Declaration of Default, for such amount as may appear to be unpaid thereon, together with charges, costs and attorney's fees, as above provided, and waive and release all errors which may intervene in any such proceedings and waive all right of appeal and consent to immediate execution upon such judgment nor shall any bill in equity be filed to interfere in any manner with the operation of such judgment, hereby ratifying and confirming all that said Attorney may do by virtue hereof, and waiving and releasing benefit of all appraisement, inquisition of real estate, hereby voluntarily condemning said real estate and authorizing the entry of such condemnation upon any writ issued, stay of execution and all rights under the exemption laws of any State, now in force, or hereafter to be passed.

 

_____          _Ismail S. Latif_____ (Seal)

Witness                                                   Franchisee – Ismail S. Latif

# ADVERTISING POOL AGREEMENT

This Agreement is made this _____8_____ day of February, 2012, by and among the licensed AAMCO franchisees (hereinafter "Members") in the Designated Market Area ("DMA") of Pittsburgh, as determined by Nielsen or a comparable rating service.

WHEREAS, the parties are all presently licensed franchisees of AAMCO Transmissions, Inc. ("ATI") pursuant to individual Franchise Agreements with ATI, operating and maintaining AAMCO Transmissions repair centers in the Pittsburgh DMA (hereinafter "Area"):

WHEREAS, each party is required by his Franchise Agreement with ATI to participate in a local advertising program;

WHEREAS, each party by his Franchise Agreement with ATI agreed to adhere to a local advertising budget and to pay his proportionate share of such budget;

WHEREAS, the parties, for their mutual benefit, desire to formally record their enforceable agreement respecting their obligations for, and contributions to a budget for a local advertising program.

NOW, THEREFORE, for and in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.    **Formation of AAMCO Dealers Advertising Association**

The parties form a non-profit, unincorporated association to be known as the Pittsburgh, PA AAMCO Dealers Association (hereinafter "Association" or "Pool").  The purpose of this Association shall be:

    (a)    to promulgate a unified and continuing advertising program in the Area;

    (b)    to administer and supervise that program and to enforce this Agreement;

    (c)    to regulate the manner in which advertising costs will be shared in the best interests of the parties hereto;

    (d)    to collect assessments from Members to pay those costs; and

    (e)    to pay those costs incurred by such advertising.

All parties to this Agreement shall be Members of the Association formed.  All future licensed AAMCO franchisees in the covered Area shall have membership in this Association upon execution of their AAMCO Franchise Agreement and a copy of this Agreement.  All parties agree that the Agreement may be executed in counterparts and will be effective upon new Members without additional execution by existing Members.

2.    **Local Advertising**

The parties all acknowledge that local advertising is necessary for the successful operation of their AAMCO Transmission centers. The long-term commitment to advertising made by all the Members is essential to the long-term success of each Member's AAMCO center. That long-term benefit is part of the consideration for the long-term commitment which each Member is hereby making. The parties also acknowledge that all advertising must be approved by ATI prior to its use. Accordingly,

(a)    Each party agrees to endorse, participate, and cooperate, through the payment of regular weekly Assessments, in an advertising program established and administered by the Association.

(b)    Each party agrees to refrain from any unilateral action in advertising expenditures, advertising media purchases or use of advertising material, unless that party has completely fulfilled his obligations under this Agreement, or until such action is approved by the Association, in addition to any such approval as is required from ATI in each Member's Franchise Agreement;

(c)    Each party acknowledges and agrees that the advertising by the Association pursuant to this Agreement directly serves and benefits his AAMCO Transmissions repair center, whether or not he is a contributor to such advertising; therefore, each party agrees that, so long as he operates an AAMCO Transmission repair center in the Area, he will pay and be responsible for payment of his weekly Assessments, as defined in paragraph 3, regardless of his or anyone else's subsequent status as a delinquent or defaulted Member of the Association.

(d)    Each party agrees that he will submit to the Association any and all information required to administer the advertising program and budget.

(e)    Should the Association designate an advertising committee to administer its advertising program, each party hereto agrees to be bound by the decisions of that committee. The committee shall be appointed by the Chairman and approved by majority vote at a regularly scheduled meeting.

3.    **Payment of Advertising Expenses**

(a)    Each party agrees to pay to the Association, or directly to an advertising agency duly selected by the Association and approved by ATI, the most-recently approved weekly contribution toward the costs of such advertising program or programs as the Association selects (hereafter, the "Assessment").

(b)    Each party agrees that the Assessment will be determined by a simple majority vote of the centers by the Members represented and eligible to vote at a duly-called meeting, and agrees to be bound by such vote.

(c)    As of the date of this Agreement, the Assessment for all Association Members shall be $180.00 per week. All parties acknowledge that this amount may change upon a subsequent vote.

2

4. **Officers**

(a)     It is agreed that once a year, the Association shall elect, by simple majority of eligible centers, a Chairman and a Secretary/Treasurer from among those Members who are not delinquent or in default at the time of the election.

(b)     The post of Secretary/Treasurer may be divided between two members upon the vote of a simple majority of the Members voting, either in person or by written proxy.

(c)     In the event that no candidate receives a simple majority in any such election, a run-off shall be held between the two candidates who received the most votes.

(d)     (1) Subject to the restrictions in paragraph 4(d)(2), below, every person who is or was an officer or agent of the Association, or who serves or has served in any capacity with any other enterprise at the request of the Association, shall be indemnified by the Association against all expenses and liabilities reasonably incurred by or imposed on him or her in connection with any proceedings to which he or she has been or may be made a party, or any proceedings in which he or she may become involved by reason of being or having been an officer of the Association, or by reason of serving or having served another enterprise at the request of the Association, whether or not in the capacity of officer of the Association at the time the expenses or liabilities are incurred.

(2)     With regard to any civil third-party claim brought against the officer or agent, the Association shall indemnify the officer or agent pursuant to Paragraph 4(d)(1), above, provided the officer or agent acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Association.  With regard to any criminal proceeding brought against the officer or agent, the Association shall indemnify him or her provided the officer or agent had no reasonable cause to believe his or her conduct was unlawful.

5. **Administration of the Association**

(a)     The parties agree that the Association shall meet at least once a year and that notice of each meeting shall be given orally or in writing to each member at his place of business at least three (3) days in advance of such meeting, except that notice for any meeting at which a vote will be taken regarding advertising assessments must be in writing and at least seven (7) days in advance of such meeting.  The date of the Notice shall be the date of mailing.

(b)     It is agreed that the quorum necessary for any vote, including a vote to change the Assessment, shall be Members, either present or represented by written proxy, comprising at least a simple majority of all centers in the Association which are eligible to vote at the time of the meeting.

(c)     It is agreed that, except as set forth in paragraph 16 below, the Association shall take action on any matter, including a change in the Assessment, only upon the vote of a simple majority of its eligible Members voting, either in person or by written proxy.  It is further agreed that in the event that the Members of the Association are tied in any vote, then the Chairman of the Association shall cast a second, tie-breaking vote.

(d)     It is agreed that votes shall be counted by the number of centers represented.  Centers with multiple owners shall be permitted only one (1) vote.  Members with multiple centers shall be permitted a number of votes equal to the number of centers they own.

(e)     No Member who is in default, as defined by paragraph 6(B)(2) below, shall be permitted to vote on any matter until such default is completely cured, including payment of all fees

3

and costs as set forth herein.  Such defaulted Member shall not be counted for the purpose of establishing the presence of a quorum at any meeting.

(f)     The parties may adopt any procedures and guidelines necessary for enforcement and implementation of the terms of this Agreement upon the vote of a simple majority of its eligible Members voting.

(g)     The parties agree that all money expended for advertising shall be in accordance with an approved budget based upon moneys collected or to be collected pursuant to the terms hereof.

6.     **Delinquency in Payment of Advertising Assessments**

(a)     Should any Member fail to pay his Assessment by the date set by either the Association or its duly selected advertising agency, that Member shall be considered delinquent pursuant to the terms of this Agreement.

(b)     When any Member is delinquent for a period of two (2) weeks, the following collection procedures shall be instituted:

(1)     The Association, by or through the Secretary/Treasurer or a designated Member, will send a letter to the Member, which letter shall state the amount of the arrearage and shall demand immediate full payment;

(2)     If full payment is not received within two (2) weeks of the mailing of the letter:

(a)     the Member shall be in default under this Agreement

(b)     the Pool Chairman shall notify the Member of his default and inform him that he is subject to suit for costs and fees in addition to arrearages.

(3)     Should the Member not make immediate, full payment in response to the Chairman's notice:

(a)     the matter will be turned over to an attorney for collection with the Member responsible for payment of all collection, attorney and court fees, and costs

(b)     the Member will be assessed a flat $25.00 fee for every week in which the center in question remains five or more weeks in arrears.

7.     **Liability of Member Upon Default**

(a)     It is agreed that a Member shall continue to be liable for the payment of his Assessments regardless of whether the Member is delinquent and/or in default as set forth in paragraph 6 above.  If a Member defaults as defined in paragraph 6 above, the Association shall have a cause of action against the Member for such default.  The Member in default also agrees to pay all attorneys' fees and all other fees and costs incurred by the Association or ATI in connection therewith.  In the event of suit or action, this amount of these fees and costs shall be made a part of any judgment obtained against Member.  However, once such fees and costs are incurred, the obligation of the Member in default to reimburse them shall exist whether or not the default is pursued to judgment.

4

(b)     The parties further acknowledge and agree that all Assessments shall continue to accrue against and be payable by a Member for as long as the Member continues to be an authorized AAMCO franchisee, or for such time as the Member shall continue to use the name "AAMCO" for the purpose of procuring automotive repair business of any nature whatsoever, whichever shall be later.   All accrued amounts shall remain due and owing and shall survive cessation by a Member of his AAMCO Transmission repair business and be subject to interest and attorneys fees and costs as set forth above.

8.     **Enforcement of Terms of Agreement**

(a)     The parties acknowledge and agree that it may be necessary for the Association by, through and on behalf of its Members, to pursue a claim for non-payment of advertising Assessments against Members or former Members of the Association, who are in default. It is agreed that parties may nominate or appoint the Association, or one or more of its Members, or ATI, or its governing body, or a trustee, to pursue such claim, with or without litigation, and to take such action as the officers or other governing body, in their discretion, deem necessary for the purpose of the enforcement and collection of such claim.   All Members hereby authorize the Chairman of the Association, or his designee, to sign on their behalf all pleadings or other papers necessary or useful to pursue such claims.

(b)     The parties further acknowledge and agree that the Association by and through any of its designated Members, governing body or trustee may, from time to time, retain the services of an attorney for the purpose of collecting defaults from Members and former Members and to perform other legal services.   The parties authorize the Association to expend the funds reasonable and necessary for attorneys' fees and court costs for such claims, the amount of such funds to become part of the obligation of the defaulted Member, or if the services are of a general nature, part of the obligation of all Members.

(c)     The parties further agree that any damages resulting from unapproved advertising as provided in paragraph 2(b) on the part of a Member will be reimbursed by the Member to the Association for the purchase of corrective advertising.   The parties authorize the Association to expend funds reasonable and necessary for attorneys' fees and court costs to collect the damages.  The amount of these legal fees shall become the obligation of the Member or Members who participated in the unapproved advertising.

(d)     Litigation, Arbitration and Venue - All disputes, controversies or claims arising out of or relating to this Agreement may be settled by Court action in any court having jurisdiction or by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association or its successor, at the sole option of the Association.   Arbitration shall be conducted in Pennsylvania unless otherwise agreed to by the parties.

9.     **Waiver**

Each party does hereby waive presentment, demand for payment, notice of dishonor, protest, notice of non-payment or protest, diligence in collection and any and all other conditions precedent which are constitutionally waivable in order for the Association to bring suit for collection of moneys then due or for the enforcement prospectively of the terms of this Agreement.

10.     **Relief Available**

The parties agree that, in addition to any other damages to which the Association may be entitled, the Association shall also be entitled to specific performance of all the terms and provisions of this Agreement.  Furthermore, the parties agree that any Member who is in default and

is still operating an AAMCO center, or is still trading under the name "AAMCO," is unjustly enriched at the expense of all other parties who have paid and are continuing to pay the advertising Assessments pursuant to the terms of this Agreement.

11.   **Concurrent Remedies**

No right or remedy herein conferred on or reserved to the parties or the Association shall be exclusive of any other right or remedy provided herein or provided or permitted by law or equity, but such right or remedy shall be cumulative of every other right or remedy given hereunder or now hereafter existing at law or in equity or by statute or otherwise and may be enforced concurrently therewith or from time to time.

12.   **Controlling Law**

This Agreement shall be deemed to have been made in the State of Pennsylvania and shall be interpreted according to the laws of the State of Pennsylvania.

13.   **Severability**

Any provision of this Agreement prohibited by law or by court decree in any state of jurisdiction shall be ineffective to the extent of such prohibition without in any way invalidating or affecting the remaining provisions of this Agreement.   To the extent that any provision hereof contravenes the law of any state or jurisdiction, it shall be deemed not to be a part of this Agreement in that state or jurisdiction.

14.   **Notices**

Service of all notices under this Agreement (unless herein provided otherwise) shall be sufficient if given telephonically, personally, mailed, faxed or delivered by a recognized overnight carrier to the party involved at his business address.   Any such notice mailed to such address shall be effective when deposited in the United States mail, duly addressed and stamped.

15.   **Parties Bound**

(a)      This Agreement shall be binding upon and inure to the benefit of the parties, their respective heirs, executors, administrators, legal representatives, successors, assigns and any corporations owned or controlled by them.

(b)      Each Member agrees that prior to the effective date of any transfer of an interest in his AAMCO Transmissions center to a third party, he will give notice to the Association. Each party agrees to continue to be obligated for all his accrued obligations to the Association and to continue to be obligated to the Association prospectively until such time as the transferee of such Member's interest becomes a member of the Association.   In addition to the continued obligation until acceptance of the transferee, the Member-transferor agrees to pay on or before closing on the transfer of his business any and all then-due moneys owed to the Association.

16.   **Entire Agreement**

This Agreement constitutes the entire Agreement between the parties and supersedes any prior understanding, written or oral agreement between the parties respecting the subject matter herein.   Amendments shall be permitted upon a vote of sixty percent (60%) of the eligible centers represented by the Members present and voting and shall be in writing and signed by the parties.

17.     **Term**

The term of this Agreement shall begin on the date of execution hereof and shall continue until terminated by written agreement of all the parties hereto at the time of such termination agreement.

18.     **Transferability**

Each party agrees that should it be deemed necessary for the Association to incorporate, then any and all obligations of each party shall be fully transferable to the corporation so formed. Each party further agrees to execute all documents necessary to evidence such transfer; however, even without the execution of such documents, the party's obligation shall be deemed transferred.

19.     **Acknowledgment**

EACH PARTY HEREBY ACKNOWLEDGES THAT HE HAS READ THIS AGREEMENT AND AGREES TO BE BOUND BY ITS TERMS.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby have executed this Agreement.

_Ismail S. Latif_
Franchisee – Ismail S. Latif

7

# EXHIBIT B



*file copy*

April 3, 2013

**VIA REGULAR MAIL and CERTIFIED MAIL – RRR (both addresses)**

Mr. Ismail S. Latif
AAMCO Transmission Center
411Suncrest Towne Centre Drive
Morgantown, WV  26505

Mr. Ismail S. Latif
223 Jaco Drive
Morgantown, WV 26505

RE:   <u>Notice of Material Breach of Franchise Agreement</u>
      **AAMCO Transmission Center**
      **411Suncrest Towne Centre Drive**
      **Morgantown, WV  26505**

Dear Mr. Latif:

This letter shall serve as written notice of the material breach of your Franchise Agreement with AAMCO Transmissions, Inc. ("ATI") dated December 10, 2007.  As a result of complaints received from other AAMCO Transmission Centers, ATI conducted an investigation which documents that on more than one occasion, your AAMCO Transmission Center located in Morgantown, West Virginia (the "Center") fraudulently sold repairs to customers that were not performed. Set forth below is a synopsis of the facts procured from ATI's investigation.

Your Center was originally opened just over a year ago, in February of 2012.  Since then, you have rarely visited the Center and have hired a variety of managers to operate it in your absence.  Your Center has generated numerous customer complaints to ATI alleging that your business has failed to provide prompt and workmanlike services.

In January 2013, the AAMCO Transmission Center located in Egg Harbor, NJ reported that it had been presented with a 2004 Nissan Maxima originating from your Center with a repair order reflecting charges for a new exhaust system and used subframe installation.  The Egg Harbor center reported, however, that it did not appear that any of this work had ever been performed.  In response, ATI's field investigator, Joe Riccardi, travelled to the Egg Harbor center, examined the vehicle in question and confirmed that none of the work had been performed. Mr. Riccardi's forensic examination was fully documented.

In February of 2013, the AAMCO Transmission Center in Reading Pennsylvania reported that it had been presented with a 2007 Chevy Silverado originating from your Center. Records show that the warranty company, Cars Warranty, paid your Center for the installation of a used transmission along with a rebuilt torque converter and rebuilt transfer case.  When the Reading center inspected the vehicle, however, it did not appear that the repairs had been performed. Mr. Riccardi was again sent to perform a forensic inspection of the vehicle. Upon a fully documented inspection, Mr. Riccardi confirmed that neither the torque converter nor the transfer case had ever been replaced.

In March of 2013, during a routine visit to your Center from ATI's Franchise Support Manager, Ron Klemm, it was discovered that the vehicle of customer, Robert Rietzle, had been on the Center premises for an unacceptably long period of time and that the customer appeared to be getting the "run around". The customer's vehicle was towed to a nearby AAMCO center for immediate assistance. The AAMCO Transmission Center in Washington, Pennsylvania reported to ATI that it had performed a minor adjustment to correct the drivability problem with the vehicle but noticed that the transmission which was supposedly rebuilt by your Center appeared instead to be a used unit. There was no indication that the unit had ever been rebuilt. Again, Mr. Riccardi was sent to perform a forensic investigation and, after a careful and documented examination, confirmed that the unit was never rebuilt.

Also in March of 2013, ATI received a report from another AAMCO Transmission Center concerning one of the vehicles supposedly repaired by your Center. The AAMCO Transmission Center in Pittsburgh Pennsylvania reported that it had been authorized by your Center to perform warranty repairs on a transmission which your Center claims to have rebuilt for a 2005 Ford Explorer. Mr. Riccardi interviewed the builder in Pittsburgh who attested that the only part that he observed as being replaced by your Center was a torque converter. It was this builder's observation that your Center had not rebuilt the transmission.  Mr. Riccardi examined the parts removed by the Pittsburgh center and agreed with the builder's conclusion.

Finally, in light of the foregoing history of repairs supposedly performed by your Center, Mr. Riccardi met with and interviewed your former employee, Adam Munsted, who previously served as your Center's service manager.  Mr. Munsted, during a recorded interview, admitted to Mr. Riccardi that it was a common practice, encouraged by you personally, to recommend unneeded services and to use junkyard components misrepresented to be rebuilt or new.

Based on the foregoing mountain of evidence, ATI has concluded that you are in material breach of your Franchise Agreement for failure to deal honestly with customers and ATI. Although ATI is entitled under your Franchise Agreement to immediately terminate your franchise to operate at the Morgantown location, ATI has decided to afford you a one time opportunity to come to this office and meet with senior management to discuss ATI's findings and your future in this franchise system.

Please contact me upon receipt of this letter to schedule a meeting date within the next two (2) weeks to come here and meet with senior management. If I do not hear from you within five (5) days of this letter, I will assume you are not interested in discussing an amicable resolution and ATI will proceed accordingly. I look forward to hearing from you.

Sincerely,
AAMCO TRANSMISSSIONS, INC.

William B. Jameson
Associate General Counsel

cc:      Mike Pekula, Rich Kolman, Brian O'Donnell, Mike Sumsky, Bret Bero

# EXHIBIT C

**Jameson, Will**

| | |
|---|---|
| **From:** | Chidsey, Bruce |
| **Sent:** | Monday, April 15, 2013 4:30 PM |
| **To:** | Ismail Latif |
| **Cc:** | O'Donnell, Brian; Kolman,Richard; Klemm,Ron; Jameson, Will |
| **Subject:** | RE: Meeting Date |

Ismail, that is precisely why you need to get here immediately and meet with us. In fact, I am pulling Ron Klemm from your facility and all communications can now be done through Will Jameson and/or Richard Kolman until this is matter is rectified. I'm sorry you chose to handle it this way Ismail.

Bruce E. Chidsey
AAMCO Transmissions and Total Car Care
Vice President Franchise Support
201 Gibraltar Road
Horsham, PA 19044
Tel: 610-668-2900, ext 410
Cell: 215-601-5410


-----Original Message-----
From: Ismail Latif [mailto:ilatif333@frontier.com]
Sent: Monday, April 15, 2013 4:11 PM
To: Chidsey, Bruce
Cc: Klemm,Ron
Subject: Re: Meeting Date

Why is that? He is telling I rarely go to the shop. That is totally wrong. He says I told a CSM to charge falls charges to make money. I always tell my CSMs to charge the right charges just to the service we provided. It is totally humiliating someone to accuse like that. Thanks.

Ismail
----- Original Message -----
From: "Bruce Chidsey" <BChidsey@aamco.com>
To: "Ismail Latif" <ilatif333@frontier.com>
Cc: "Brian O'Donnell" <BO'Donnell@aamco.com>, "Ron Klemm" <RKlemm@aamco.com>, "Will Jameson" <wjameson@cottman.com>, "Richard Kolman" <RKolman@americandriveline.com>
Sent: Monday, April 15, 2013 3:56:27 PM
Subject: RE: Meeting Date

Really BIG MISTAKE Ismail!

Thank you,
BC

-----Original Message-----
From: Ismail Latif [mailto:ilatif333@frontier.com]
Sent: Monday, April 15, 2013 3:54 PM
To: Chidsey, Bruce
Cc: Klemm,Ron
Subject: Re: Meeting Date

Bruce,

I have gone through the letter. It is a slap in the face for me after investing so much money and time for introducing a new concept to this franchise. There is a picture in the AAMCO Corporate hallway showing a dream concept to this franchise. I made that concept as a reality. I will send a direct email reply to Mr. Jameson in few days and I will copy to you. Thanks.

Ismail
----- Original Message -----
From: "Bruce Chidsey" <BChidsey@aamco.com>
To: ilatif333@frontier.com
Cc: "Will Jameson" <wjameson@cottman.com>, "Richard Kolman" <RKolman@americandriveline.com>, "Brian O'Donnell" <BO'Donnell@aamco.com>, "Michael Pekula" <mpekula@americandriveline.com>
Sent: Monday, April 15, 2013 9:32:44 AM
Subject: Meeting Date


Ismail, I need that date that you will come to the Home Office in Horsham Pa today please. This meeting must happen and you must not ignore my request.  Understand that you have had fair time to respond.



Bruce E. Chidsey

AAMCO Transmissions and Total Car Care

Vice President Franchise Support

201 Gibraltar Road

Horsham, PA 19044

Tel: 610-668-2900, ext 410

Cell: 215-601-5410

P Please consider the environment before printing this email

# EXHIBIT D



*The Trusted Experts for over 50 Years*

April 16, 2013

**VIA CERTIFIED MAIL – RRR and EMAIL (ilatif@frontier.com)**
Mr. Ismail S. Latif
AAMCO Transmission Center
411Suncrest Towne Centre Drive
Morgantown, WV  26505

      **RE:**    <u>Termination of Franchise Agreement</u>
                **AAMCO Transmission Center**
                **411Suncrest Towne Centre Drive**
                **Morgantown, WV  26505**

Dear Mr. Latif:

      Your email exchange with Bruce Chidsey of April 15, 2013 has been reviewed by senior management. It was not well received. Although you state that you will be providing a written response to me in "a few days", it was decided, in light of your email communication to Mr. Chidsey, to terminate your Franchise Agreement immediately, without further discourse.  Please know that the purpose of ATI's letter to you dated April 4, 2013 was not to "humiliate" you.  To the contrary, the purpose of the letter was to share with you the results of ATI's investigation which documented that several of your customers had not received the services that they had paid you for, and to communicate to you the serious nature of these transgressions. Your response to Mr. Chidsey indicates that you have chosen not to acknowledge that message. Please understand that the good will generated by the AAMCO trade name is the quintessential asset of this franchise system and ATI cannot allow it to be abused under any circumstances.

      ATI hereby terminates your Franchise Agreement with ATI dated December 10, 2007. You have breached Paragraph 8(a) of the Franchise Agreement which provides that you must at all times "deal fairly and honestly with AAMCO and with each customer".  Pursuant to Paragraph 19.1(d) of the Franchise Agreement, this breach is non-curable and, as such, this termination notice is "effective upon receipt by Franchisee".

      Accordingly, ATI demands that you immediately comply with the post-termination covenants of the franchise agreement by, among other things, (1) promptly paying ATI all sums due and owing; (2) immediately and permanently discontinuing the use of the mark AAMCO and all similar names and marks; (3) promptly surrendering to ATI all signs, training materials, manuals, videos, stationery, letterhead, forms and other printed material containing AAMCO marks; (4) immediately and permanently discontinuing all advertising as an authorized AAMCO dealer; and (5) promptly transferring to ATI or ATI's designee each telephone listing under the designation AAMCO or any similar designation; and (6) complying with the post-termination covenant not to compete.

---

If you fail to comply with the post-termination covenants of the Franchise Agreement, ATI will initiate a legal proceeding seeking an order compelling your compliance and will seek to recover from you the expenses associated with the legal proceeding as provided for in Section 26.3 of the Franchise Agreement.

Please have your attorney contact me to confirm that you will immediately comply with the foregoing requirements.

Sincerely,

AAMCO TRANSMISSIONS, INC.

William B. Jameson
Associate General Counsel

cc:   Mike Pekula, Rich Kolman, Brian O'Donnell, Mike Sumsky, Bret Bero